Bob Pemberton, Justice
This appeal requires us to ascertain the nature and parameters of "derivative" sovereign immunity for government contractors as recognized under current Texas law-a matter going to the trial court's jurisdiction to adjudicate a lawsuit and not necessarily the merits of the lawsuit itself. Our conclusions and their application to the record in this case require us to affirm in part and reverse in part.
BACKGROUND
In September 2014, the Texas Lottery launched retail sales of a "scratch-off" or "instant" ticket product known as "Fun 5's." As the name alludes, Fun 5's combined five different instant games onto a single ticket and was sold for a retail price of $5 each. A reduced-size image of the *771 Fun 5's ticket sold at retail is provided below[1] :
Our focus is the game situated in the lower right-hand corner of the Fun 5's ticket and featured in the inset, labeled as "Game 5." In Game 5, a contestant won a prize if three "5" symbols appeared in any one row of the tic-tac-toe grid when the latex coating was removed. The amount of that prize was revealed in the "PRIZE" box below the grid, and ranged between $5 to $100,000. However, if a "moneybag" icon appeared in the "5x BOX" below the grid, the prize amount would be increased fivefold, elevating the range to between $25 and $500,000.
Although the moneybag icon was a prize multiplier having effect only on tickets that won in tic-tac-toe, Game 5 was configured so that the moneybag multiplier would appear not only on a subset of the winning tickets, but also on roughly 25 percent of non-winning tickets, a security measure deemed advisable by the Texas Lottery Commission (TLC) to prevent advance discovery of winning tickets merely by "microscratching" the 5x BOX to find moneybag icons. But after Fun 5's sales began, a number of purchasers who had uncovered moneybag icons on non-winning tickets in Game 5 asserted that the game instructions printed on the ticket-
Reveal three "5" symbols in any one row, column, or diagonal, win PRIZE in PRIZE box. Reveal a Money Bag "[icon]" symbol in the 5X BOX, win 5 times that PRIZE.
*772 -meant or appeared to mean that the moneybag icon alone entitled them to a prize equaling five times the amount shown in the PRIZE box. In other words, these purchasers claimed to understand that the second sentence of the instructions, referencing the moneybag icon, promised an independent, alternative means of winning in Game 5 in addition to the tic-tac-toe game referenced in the first sentence, as opposed to describing what was actually a multiplier contingent upon a single method of winning a prize through tic-tac-toe. In some instances, including some that were reported in the media, this asserted discrepancy between Game 5's instructions versus actual parameters purportedly misled some Fun 5's purchasers to perceive themselves winners of large prizes when uncovering moneybag icons on their tickets, only to have their elation crushed when they attempted to collect. The TLC ultimately ended sales of Fun 5's earlier than it had planned, citing "feedback from some players expressing confusion regarding certain aspects of this popular game," and adding that "a few opportunistic individuals appear to be exploiting the situation."
Ensuing lawsuits grew to include over 1,200 original or intervening plaintiffs who had allegedly purchased Fun 5's tickets and incurred injury from the asserted discrepancy between Game 5's instructions and actual parameters. While a single plaintiff (Nettles) filed suit in Dallas County, the others (the Steele Plaintiffs) joined in the cause giving rise to this appeal, filed in Travis County district court. Both suits targeted GTECH Corporation (GTECH), which participated, under contract with the TLC, in the development, printing, and distribution of the Fun 5's product and programming of the computer system used to verify winners.[2] The merits of these claims or of their underlying reading of the Game 5 instructions are not yet before us. Our present concern, rather, relates to the sovereign immunity that would unquestionably be implicated were the claims asserted instead against TLC, a state agency,[3] and whether GTECH can "derivatively" benefit from that immunity here.[4]
GTECH filed a plea to the jurisdiction asserting that the Steele Plaintiffs' claims were barred by sovereign immunity derived from TLC's immunity, thereby depriving the Travis County district court of subject-matter jurisdiction to adjudicate *773 the claims. GTECH had also asserted a similar plea in the Nettles suit. The Dallas district court granted that plea, and this ruling was recently upheld in a memorandum opinion of the Fifth Court of Appeals.[5] But the Travis County district court denied GTECH's plea as to the Steele Plaintiffs' claims. In this cause, GTECH has appealed that order to this Court, urging that the district court erred in failing to grant the plea based on derivative sovereign immunity.[6]
STANDARD OF REVIEW
Because subject-matter jurisdiction is a question of law, we review de novo a trial court's ultimate ruling on a plea to the jurisdiction.[7] The Steele Plaintiffs had the burden in the first instance to plead or present evidence of facts that would affirmatively demonstrate the district court's jurisdiction to decide their claims.[8] We construe their pleadings liberally in favor of jurisdiction, taking their factual allegations as true except to the extent negated by evidence.[9] Both the Steele Plaintiffs and GTECH presented evidence each deemed material to the jurisdictional issue. In practical terms, this proof could negate jurisdictional facts alleged by the Steele Plaintiffs only to the extent it is conclusively in GTECH's favor.[10] We view the *774 evidence in the light favorable to the Steele Plaintiffs.[11]
Sovereign immunity-the age-old common-law doctrine holding that " 'no state can be sued in her own courts without her consent, and then only in the manner indicated by that consent' "[12] -encompasses an immunity from suit that implicates a trial court's jurisdiction to decide pending claims,[13] and to this extent can properly be asserted through a plea to the jurisdiction.[14] But sovereign immunity would come into play here only if GTECH has met an initial burden of establishing that the Steele Plaintiffs' claims against it actually implicate that immunity.[15] While the parties agree that it is theoretically possible for claims against a private government contractor like GTECH to implicate the government's sovereign immunity, they differ regarding the conditions *775 under which this is so and, in turn, the showing that GTECH must make.
THE IMPORT OF BROWN & GAY
GTECH argues that it is derivatively shielded by the TLC's sovereign immunity if it can show that it is being sued merely for complying with the TLC's decisions or directives-i.e., for what were ultimately actions of or attributable to TLC that GTECH merely carried out-on which GTECH exercised no "independent discretion." While agreeing with GTECH to the extent that the contractor must have "exercised no discretion in activities giving rise to [their] claims," the Steele Plaintiffs urge that GTECH was also required to make an additional, independent showing that "extending" TLC's immunity to GTECH under the particular circumstances of this case would actually advance the fiscal and policy rationales that underlie sovereign-immunity doctrine. The respective arguments are grounded in competing views of Brown & Gay Engineering, Incorporated v. Olivares ,[16] the first case in which the Texas Supreme Court professed to "directly address[ ] the extension of immunity to private government contractors."[17]
Brown & Gay arose from a fatal automobile accident that occurred on a tollway under the purview of the Fort Bend County Toll Road Authority, a local-government corporation possessing delegated power to design, build, and operate the tollway.[18] Through a statutorily authorized contract, the Authority had delegated to Brown & Gay Engineering, an independent contractor, the responsibility of designing road signs and traffic layouts on the tollway, subject to the approval of the Authority's governing board.[19] The fatality occurred when, following construction, an intoxicated motorist drove onto the tollway through an exit ramp and continued for several miles in the wrong direction before colliding with a car driven by Pedro Olivares, killing both drivers.[20] Olivares' estate and his parents sued defendants that included Brown & Gay, alleging that the firm's negligent failure to design and install proper signs, warning flashers, and other traffic-control devices had proximately caused Olivares' death.[21]
Brown & Gay interposed a plea to the jurisdiction predicated on the same governmental immunity enjoyed by the Authority (whose immunity was ultimately uncontested).[22] Brown & Gay prevailed in the trial court, lost in the court of appeals, and sought review in the Texas Supreme Court.[23] As Brown & Gay's jurisdictional theories had evolved by that juncture, its material arguments were that its status as an independent contractor of the Authority (as opposed to an Authority employee acting in official capacity) did not singularly foreclose its reliance on the Authority's immunity; that courts in Texas and elsewhere had previously recognized that independent government contractors could be shielded by the immunity of the governmental *776 party to the contract; and that the underlying purposes of sovereign immunity are served by extending it to private entities performing authorized governmental functions for which the government itself would be immune, in a manner similar to the governmental immunity enjoyed by Texas's political subdivisions.[24]
In the context of the Olivareses' claims and Brown & Gay's arguments, the Texas Supreme Court identified the question presented as whether "a private company that performed allegedly negligent acts in carrying out a contract with a governmental unit [can] invoke the same immunity that the government itself enjoys,"[25] and more specifically, "whether, as a matter of common law, the boundaries of sovereign immunity encompass private government contractors exercising their independent discretion in performing government functions."[26] This framing of the issue, as further highlighted and confirmed by numerous similar subsequent references to Brown & Gay's "independent discretion," "independent negligence," "own negligence," and the like throughout the remainder of the opinion,[27] served to emphasize that the Olivareses were suing Brown & Gay for alleged conduct that neither party had attempted to attribute to the actions or directives of the Authority. That posture proves significant in understanding the analysis that followed.
To resolve the question it had identified, the Brown & Gay court looked to two sets of considerations that are material to the present case. First, in a section of the opinion titled, "Extending Sovereign Immunity to Brown & Gay Does Not Further the Doctrine's Rationale and Purpose," the supreme court considered whether "extend[ing] sovereign immunity to private contractors like Brown & Gay ... comports with and furthers the legitimate purposes that justify this otherwise harsh doctrine."[28] This analysis responded to arguments advanced by Brown & Gay and an amicus, who, in an attempt to evoke the fiscal justifications underlying contemporary sovereign-immunity doctrine, had urged that immunizing contractors in the circumstances presented would ultimately reduce costs to government, at least over the long term, because contractors would otherwise pass on the costs associated with litigation exposure through higher contract prices.[29] The supreme court disagreed that this asserted concern justified extending sovereign immunity to Brown & Gay.
The supreme court first questioned the premise that the contractors' litigation costs would necessarily be passed on to the government, noting the "highly competitive world of government contract-bidding" and "the fact that private companies can and do manage their risk exposure by obtaining insurance."[30] "But even assuming that holding private entities liable for their own negligence in fact makes contracting with those entities more expensive for the government," the court maintained, sovereign immunity was not "strictly a cost-saving measure" and "has *777 never been defended as a mechanism to avoid any and all increases in public expenditures."[31] Rather, the court explained, sovereign immunity was more precisely "designed to guard against the 'unforeseen expenditures' associated with the government's defending lawsuits and paying judgments 'that could hamper government functions' by diverting funds from their allocated purposes."[32] "Even if holding a private party liable for its own improvident actions in performing a government contract indirectly leads to higher overall costs to government entities in engaging private contractors," the court reasoned, "those costs will be reflected in the negotiated contract price," thus enabling "the government to plan spending on the project with reasonable accuracy."[33] "Accordingly," the supreme court concluded, "the rationale underlying the doctrine of sovereign immunity does not support extending that immunity to Brown & Gay."[34]
In the Brown & Gay court's second set of considerations, preceded by the heading "Sovereign Immunity Does Not Extend to Private Contractors Exercising Independent Discretion," it sought to identity material features of the claims addressed in prior cases from other courts in which independent government contractors had been held immune.[35] In part, the court emphasized the line of federal cases that had emanated from the United States Supreme Court's decision in Yearsley v. W.A. Ross Construction Company .[36] In Yearsley , a private contractor had constructed dikes under a contract with the federal government and was later sued by a landowner who alleged that the dikes had caused erosion and loss of land.[37] It was undisputed that the contractor's work "was all authorized and directed by the Government of the United States," and that the government's actions were authorized by congressional act.[38] The Yearsley court held that where the government's "authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress," there is "no liability on the part of the contractor" merely for performing as the government had directed.[39] That court contrasted this situation with cases in which liability had been imposed on government contractors, which it characterized as having turned on acts exceeding the contractor's authority or authority that had not been validly conferred.[40]
Although the United States Supreme Court did not explicitly couch Yearsley 's analysis in terms of sovereign immunity, and that court would later indicate in the Campbell-Ewald case that the protection would instead be a type of common-law "immunity" that is not "the Government's embracive immunity,"[41] a number of lower federal courts had deduced in the meantime *778 that Yearsley recognized a form of immunity for government contractors, deriving from the government's sovereign immunity, arising when a contractor is sued for alleged acts or decisions that are substantively the government's alone. But Brown & Gay predated Campbell-Ewald , and the Texas Supreme Court cited the earlier federal lower-court cases as material to the parameters of derivative sovereign immunity under Texas common law.[42] The Brown & Gay court further quoted the following excerpt as "aptly summarizing the framework governing the extension of derivative immunity to federal contractors" in those cases:
Where the government hires a contractor to perform a given task, and specifies the manner in which the task is to be performed, and the contractor is later haled into court to answer for a harm that was caused by the contractor's compliance with the government's specifications, the contractor is entitled to the same immunity the government would enjoy, because the contractor is, under those circumstances, effectively acting as an organ of government, without independent discretion. Where, however, the contractor is hired to perform the same task, but is allowed to exercise discretion in determining how the task should be accomplished, if the manner of performing the task ultimately causes actionable harm to a third party the contractor is not entitled to derivative sovereign immunity, because the harm can be traced, not to the government's actions or decisions, but to the contractor's independent decision to perform the task in an unsafe manner. Similarly, where the contractor is hired to perform the task according to precise specifications but fails to comply with those specifications, and the contractor's deviation from the government specifications actionably harms a third party, the contractor is not entitled to immunity because, again, the harm was not caused by the government's insistence on a specified manner of performance but rather by the contractor's failure to act in accordance with the government's directives.[43]
*779 While acknowledging that it had not previously "directly addressed" whether these principles would apply to Texas government and its private contractors,[44] the Brown & Gay court observed that it had cited Yearsley favorably in an earlier case addressing the liability exposure of a government contractor for harm it inflicted due to a mistake by the government.[45] In that case, Glade v. Dietert , a city had contracted with Glade to construct a sewer line according to city-prepared plans and specifications.[46] The city was to furnish the right of way, and staked the area where Glade was to construct the line.[47] Part of the planned route traversed Dietert's property, but the city, apparently by inadvertence, had acquired only a portion of the easement needed there.[48] This resulted in Glade bulldozing an area of Dietert's property that the city had staked but that lay beyond the easement the city had secured.[49] Once the error was discovered, the city promptly commenced eminent domain proceedings and acquired the omitted right of way, but Dieter sued Glade seeking damages for the trespass that had occurred in the meantime.[50]
Dieter prevailed in the lower courts, and Glade urged the supreme court that a contractor like him could not, "in the absence of any negligence or wanton or wilful conduct ... be held liable for damages to the real property or the owner" for "perform[ing] his contract under the directions of the municipality and in strict compliance with plans and specifications furnished to him."[51] Dietert countered by emphasizing the "general rule" that a servant could not avoid personal liability for torts he committed while obeying his master's command by attributing the act to his master.[52] The supreme court agreed with Glade. It distinguished Dietert's cases as "involv[ing] suits against private corporations and their agents" and held that the controlling rule was instead that a public-works contractor "is liable to third parties only for negligence in the performance of the work and not for the result of the work performed according to the contract."[53] The Glade court cited Yearsley in support of that conclusion.[54]
Glade did not, strictly speaking, address immunity or jurisdiction-as the Brown & Gay court later observed, the city's actions had effected a taking, giving rise to a claim for compensation for which the Texas Constitution would have waived immunity.[55] Yet the Brown & Gay court noted the following common thread running through *780 Glade and the federal contractor-immunity cases:
In each of these cases, the complained-of conduct for which the contractor was immune was effectively attributed to the government. That is, the alleged cause of the injury was not the independent action of the contractor, but the action taken by the government through the contractor.[56]
The Brown & Gay court also deemed "instructive" its more recent decision in K.D.F. v. Rex .[57] The issue in K.D.F. was whether two private entities that had contracted with the Kansas Public Employees' Retirement System, a Kansas governmental entity, could benefit from the System's sovereign immunity and take advantage of a Kansas statute requiring all "actions 'directly or indirectly' against [the System]" to be brought in a particular Kansas county.[58] In answering that question, the supreme court had looked to features of the tort claims acts in both Texas and Kansas and determined that the controlling consideration was ultimately whether each company was performing ministerial functions under the control and direction of the System.[59] The court held that one of the entities, K.D.F., which held securities on the System's behalf, met this standard because it "operates solely upon the direction of [the System] and exercises no discretion in its activities," such that K.D.F. and the System were "not distinguishable from one another; a lawsuit against one is a lawsuit against the other."[60] But the court held that the other company, Pacholder, an independent investment advisor to the System, did not meet that standard because "[i]ts activities necessarily involve considerable discretion ... its role is more in the nature of advising [the System] how to proceed, rather than being subject to the direction and control of [the System]."[61] "This reasoning," the Brown & Gay court maintained, "implies that private parties exercising independent discretion are not entitled to sovereign immunity," adding that the proposition was "consistent with the reasoning federal courts have utilized in extending derivative immunity to federal contractors only in limited circumstances."[62]
The Brown & Gay court contrasted the Olivareses' claims, observing that:
the Olivareses do not complain of harm caused by Brown & Gay's implementing the Authority's specifications or following any specific government directions or orders. Under the contract at issue, Brown & Gay was responsible for preparing all "drawings, specifications, and details for all signs." Further, the Olivareses do not complain about the decision to build the Tollway or the mere fact of its existence, but that Brown & Gay was independently negligent in designing the signs and traffic layouts for the Tollway. Brown & Gay's decisions in designing the Tollway's safeguards are its own.[63]
The court similarly distinguished various Texas lower court cases on which Brown & Gay had relied to support application of the government's immunity to private contractors.[64] The gravamen of these decisions, *781 the supreme court suggested, was that the claimants were deemed in the circumstances of those cases to have sought relief against the government rather than the contractor individually.[65]
* * *
The parties' disagreement regarding GTECH's required showing distills ultimately to whether Brown & Gay 's analyses regarding sovereign immunity's "Rationale and Purpose" and "Private Contractors Exercising Independent Discretion" imply a two-element test, both of which must be proven in order for a government contractor to enjoy the government's immunity (the Steele Plaintiffs' position), or reflect two alternative analyses, either of which could support derivation or extension of the government's immunity to the contractor (GTECH's position). We ultimately conclude that GTECH is closer to the mark-to the extent GTECH can demonstrate that the Steele Plaintiffs complain substantively of actions, decisions, or directives attributable to TLC and not of GTECH's own independent exercise of discretion, (i.e., that would satisfy the considerations in Brown & Gay 's"Sovereign Immunity Does Not Extend to Private Companies Exercising Independent Discretion" discussion), the claims would implicate TLC's sovereign immunity, and GTECH would not be required to make any separate or further showing to satisfy the fiscal considerations addressed in the opinion's "Rationale and Purposes" discussion.[66]
It is true that, as the Steele Plaintiffs emphasize, the Brown & Gay court repeatedly alluded to both analyses, seemingly conjunctively, in support of its holding that immunity did not extend to the *782 contractor there.[67] But these references must read alongside the supreme court's repeated emphases that the Olivareses' claims implicated only Brown & Gay's independent discretion rather than underlying governmental acts and decisions.[68] That is to say, the Brown & Gay court's analysis of "whether to extend sovereign immunity to private contractors like Brown & Gay" in light of "whether doing so comports with and furthers the [doctrine's] legitimate purposes" was speaking only to claims that also would not implicate the government's immunity under the rationale of the Yearsley line and other cases it cited in the "Private Contractors Exercising Independent Discretion" portion of the opinion. And claims within that category-those that substantively attack underlying governmental decisions and directives effected through a contractor rather than a contractor's own independent discretionary actions-would inherently implicate the underlying fiscal policies of sovereign immunity that are addressed in the "Rationale and Purpose" section. Although this relationship is admittedly not stated explicitly in Brown & Gay , it is evident from the broader body of Texas sovereign-immunity jurisprudence.
As reflected in the doctrine's name, sovereign immunity is considered to *783 be "inherent in the nature of sovereignty,"[69] which in the State of Texas is vested in its People.[70] The state government is said to embody the People's sovereignty because it exists and functions legitimately by virtue of powers delegated through and under their Constitution and laws.[71] Accordingly, the State of Texas and its government's departments and agencies, such as the TLC, inherently possess sovereign immunity in the first instance,[72] subject to waiver by the sovereign People through their Constitution or acts of their Legislature.[73]
Although rooted historically in a perceived conceptual incompatibility of allowing the sovereign-originally embodied in the English monarch-to be sued in its own courts without its consent,[74] the modern justifications for the sovereign-immunity doctrine in Texas have centered, as the Brown & Gay court recognized, on shielding our state government (and, ultimately, the sovereign People who delegate it power and fund it through taxes) from the fiscal and policy disruptions that lawsuits and court judgments would otherwise cause to governmental functions.[75] Relatedly, sovereign immunity is said today to "preserve[ ] separation-of-powers principles by preventing the judiciary from interfering with the Legislature's prerogative to allocate tax dollars" and "leav[ing] to the Legislature the determination of when to allow tax resources to be shifted away from their intended purposes toward defending lawsuits and paying judgments."[76]
These concerns with protecting the state governmental functions deriving from the sovereign's will have informed the Texas Supreme Court's longstanding recognition that the sovereign's immunity may be implicated by lawsuits that do not explicitly name the State or the State government as a defendant. Although Texas's political subdivisions (e.g., counties, municipalities, or school districts) possess no inherent sovereignty of their own, they are said to *784 "derive governmental immunity from the state's sovereign immunity" when performing "governmental" functions as a "branch" of the State.[77] But more critically here, the supreme court has long recognized that sovereign immunity can be implicated even by claims against defendants that are not themselves governmental entities. A suit against a governmental official, employee, or other agent in his or her official capacity (i.e., seeking relief that would lie against the governmental principal rather than the agent personally, such as compelling payment of funds from the public treasury[78] ) is said to be "merely 'another way of pleading an action against the entity of which [the official] is an agent,' " as the governmental principal is the real party in interest.[79] It follows that official-capacity suits generally implicate the same sovereign immunity that would shield the governmental principal,[80] and to this extent the agent is said to enjoy the sovereign's immunity "derivatively."[81]
The exception to this general rule that an official-capacity claim implicates the governmental principal's immunity, the ultra vires claim, is itself shaped by the underlying relationship to sovereign will in a manner that is instructive here. In concept, a proper ultra vires claim-i.e., a suit to require state government to comply with its underlying delegation of power from the sovereign[82] -does not implicate the sovereign's immunity because it attacks governmental actions lacking a nexus to the sovereign's will.[83] But consistent with this notion that ultra vires acts are not acts "of the State," an ultra vires claim must formally be asserted against an appropriate governmental official, as opposed to the governmental principal, even though it lies against the official in his or her official capacity, because the objective is to restrain the governmental principal.[84] However, a proper ultra vires claim "must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act."[85] And if an ostensible ultra vires claim turns out not to meet this standard, it follows that the claim is actually seeking to judicially override the sovereign will embodied in the governmental acts and decisions made within delegated authority-to "control *785 state action"-and thereby implicates the sovereign's immunity.[86] Further, an otherwise-proper ultra vires claim also independently implicates the sovereign's immunity to the extent it seeks relief that either overtly or in effect goes beyond prospective injunctive or declaratory relief restraining the government's ultra vires conduct, such as through claims that would establish a right to retrospective monetary relief from the governmental principal, impose liability upon or interfere with the government's rights under a contract, or otherwise control state action.[87]
Importantly, although the form of the pleadings may be relevant in determining whether a particular suit implicates the sovereign's immunity, such as whether a suit is alleged explicitly against a government official in his "official capacity," it is the substance of the claims and relief sought that ultimately determine whether the sovereign is a real party in interest and its immunity thereby implicated.[88] In fact, as recognized in a recent *786 decision from this Court, the sovereign may be the real party in interest, and its immunity correspondingly implicated, even in a suit that purports to name no defendant, governmental or otherwise, yet seeks relief that would control state action.[89]
It follows from the same basic principles that the sovereign, as embodied in state governmental organs, may be the real party in interest, and its immunity implicated, by claims asserted against a private government contractor where those claims substantively attack underlying governmental decisions and directives made within delegated powers rather than the contractor's own independent discretionary acts-i.e., the sorts of claims that would implicate immunity under the "Private Contractors Exercising Independent Discretion" portion of Brown & Gay . This is so because the claims and any relief obtained would, through their effects on the contractor, impinge upon the government's exercise of its contract rights and underlying delegated authority. In these respects, such claims would be analogous to the ostensible ultra vires claims that would actually control state action by overriding government contracts[90] and sovereign will.[91] And while the immunity belongs to the government rather than the contractor, per se, that is no barrier to the contractor raising the issue. Because such immunity would implicate the trial court's subject-matter jurisdiction, the trial court would be required to address that issue regardless of how or by whom it is raised.[92]
In turn, claims against contractors that would substantively override underlying governmental decisions and directives in this way would inherently cause the unanticipated diversion of appropriated funds from their intended purposes-which brings us to the basic policy concern addressed in Brown and Gay's "Rationale and Purpose" discussion. This is so because the underlying governmental decisions and directives made within delegated authority are fueled by appropriations made (and, ultimately, taxes collected) for that purpose.[93] And such disruptions of *787 governmental functions and finances are not merely the indirect or long-term economic effects on government from lawsuits against private government contractors for their own independent discretionary acts.[94] When government contractors are sued for their own independent discretionary acts, their position is analogous to that of government employees or agents who breach personal tort duties owed to third parties independently from duties owed by their governmental principals.[95] In such instances, the employees or agents "have always been individually liable for their own torts, even when committed in the course of employment," and are not shielded by sovereign immunity against suit in their individual capacities.[96] Suits whose substance would control the government's actions within delegated powers, in contrast, implicate the government's immunity and that immunity's underlying fiscal justifications.[97]
Accordingly, to the extent GTECH can show that the Steele Plaintiffs are substantively attacking actions and underlying decisions or directives of TLC and not GTECH's independent discretionary actions, the claims would implicate TLC's immunity, and no additional showing regarding immunity's underlying fiscal rationales is required. We note that the Nettles court reached the same ultimate conclusion, albeit while relying on somewhat different reasoning.[98] Other sister courts, while not directly addressing the issue, also appear to have read Brown & Gay the same way.[99]
*788 As a final observation, determining whether claims against government contractors implicate the government's immunity necessarily entails examination of the specific contracts that delineate the contractors' authority vis a vis the government. Such questions of contractual authority, relevant to immunity, may also have implications for, and thereby overlap or parallel, the merits-related analysis of whether the contractor owes tort duties to third parties with respect to alleged injuries arising during its performance of the contract. Consequently, precedents that analyze such questions of contractual authority as they bear upon duty may also be instructive regarding derivative immunity. Examples include, in addition to Glade , two pre- Brown & Gay decisions from the Texas Supreme Court that addressed the tort exposure of government contractors while performing their contracts.
The first of these cases, issued a few years after Glade , was Strakos v. Gehring .[100] Gehring had contracted with Harris County to relocate fences incident to a road-improvement project. After the county accepted this work as complete, Strakos fell into an uncovered and unmarked post hole that Gehring had left behind, causing injury.[101] Strakos sued Gehring in negligence, and a jury awarded Strakos damages.[102] The Court of Civil Appeals had reversed the trial-level judgment for Strakos, relying on the "accepted-work" doctrine, a privity-rooted concept that had relieved an independent contractor of any duty of care to the public with respect to dangerous conditions it creates on the sole basis that the work had been completed and accepted by the party hiring it.[103] On writ of error, the Texas Supreme Court rejected the accepted-work doctrine, which had the effect, as the court observed, of bringing contractors "within the general rules of tort litigation."[104] "Our rejection of the 'accepted work' doctrine is not an imposition of absolute liability on contractors," the Gehring court elaborated, but "simply reject[s] the notion that although a contractor is found to have performed negligent work or left premises in an unsafe condition and such action or negligence is found to be a proximate cause of injury, he must nevertheless be held immune from liability solely because his work has been completed and accepted in an unsafe condition."[105]
But an additional feature of Gehring is more critical here. The supreme court rejected an attempt by Gehring to claim as a defense that his contract with Harris County had imposed no affirmative requirement that he fill the holes in question.[106] While agreeing that Gehring's contract was "silent as to this matter," the *789 court reasoned that the mere absence of any contractual requirement that he fill the holes did not obviate any duty he owed in tort.[107] However, the Gehring court contrasted this contractual structure, which left Gehring discretion to comply (or not) with a tort duty to remedy the condition, with a contract that afforded no such discretion:
[T]he contractual provisions ... are not couched in directory wording of that certainty which would require a conclusion that the act of leaving the hole was at the time of its origin and thereafter the act of Harris County and not that of the contractor, as is sometimes the case where a builder merely follows plans and specifications which have been handed to him by the other contracting party with instructions that the same be literally followed.[108]
More recently, the Texas Supreme Court had occasion to distinguish both Glade and Gehring in Allen Keller Company v. Foreman .[109] Keller, a road-construction contractor, was hired by Gillespie County to work on projects that included excavating a drainage channel through an embankment near a bridge over the Pedernales River.[110] The project served to widen a preexisting gap between the end of a bridge guardrail and the embankment, creating a physical effect that one local resident compared to a boat ramp.[111] Several months after the work was completed by Keller and accepted by the county, an out-of-control automobile went off the roadway through the gap and into the river below, where a passenger drowned.[112] Keller was subsequently named as a defendant in a wrongful-death action, with the plaintiffs relying on a premises-defect theory predicated on the gap being an unreasonably dangerous condition.[113] Keller moved for summary judgment on grounds that included the asserted absence of any duty owing to the victim even if one assumed that its work had created an unreasonably dangerous condition.[114]
Keller urged that it owed no such duty because its contract with Gillespie County had required it to construct the project precisely as it had.[115] Keller's contract with the county, as the supreme court later noted, required Keller to adhere to specifications provided by O'Malley Engineers, which had designed and engineered the project, and imposed an "absolute" obligation on Keller to perform and complete the work in accordance with the contract documents.[116] These specifications provided for excavation of the channel in the manner described, widening the gap between the guardrail and the embankment, and did not include extending the guardrail to cover the gap.[117] The contract further provided that any changes to the contract would be made by the county or O'Malley, not Keller; that the county (either directly or through O'Malley as its agent) would visit the work site to verify progress and adherence to the design; and that upon completion O'Malley would inspect the site and certify that Keller had *790 completed the work according to specifications.[118]
Although the trial court granted Keller's motion, the court of appeals reversed, holding that the summary-judgment evidence raised a fact issue as to whether Keller's work had created a dangerous condition, thereby implicitly assuming that Keller would owe a duty in that event.[119] The court of appeals had derived this premise from its reading of Gehring .[120] The Texas Supreme Court held that this was error, explaining that the point of Gehring was merely to "reject[ ] the owners' acceptance of completed work as an affirmative defense," leaving contractors subject to "general negligence principles."[121] Gehring , the Keller court stressed, did not hold that a contractor would owe a duty of care "in all circumstances."[122]
On the other hand, the supreme court also rejected the view of Keller that Glade was controlling and compelled a holding that Keller owed no duty because its work had merely complied with its contract.[123] "While Glade is not inconsistent with our decision today," the court reasoned, "its facts differ significantly and it is not determinative."[124] Instead, the supreme court maintained, it was necessary to address whether Keller owed such a duty in light of its particular circumstances. As pertinent to the present case, the court considered whether Keller owed a duty to rectify what was assumed to be the unreasonably dangerous condition of the open gap between the bridge guardrail and the embankment by physically altering that feature, such as by extending the guardrail.[125]
The Texas Supreme Court held that Keller owed no such duty because Keller's contract afforded it no discretion to rectify the condition.[126] The court observed that "Keller's contract with the County required absolute compliance with the contract specifications," such that "any decision that Keller would have made to rectify the dangerous condition would have had the effect of altering the terms of the contract."[127] These features of Keller's contract, the court added, distinguished it from the contract addressed in Gehring , which by "neither requir[ing] nor forb[idding] the contractor from filling in or marking holes that comprised the dangerous condition, ... [had] left the choice to the contractor's discretion," leaving room *791 for the application of the tort duty.[128] Keller's contract, the court further suggested, was instead like the contrasting example cited by the Gehring court, having "directory wording of that certainty which would require a conclusion that the [dangerous condition] was ... the act of [the government] and not that of the contractor."[129]
Keller and Gehring were each addressed to the government contractor's duty of care rather than the government's immunity, per se, and the same is true of Glade . Yet the underlying distinctions between cases like Keller and Glade versus Gehring also inform the immunity inquiry, as the Brown & Gay concurrence, authored by Chief Justice Hecht, observed:
We recognized in [ Keller ] that a government contractor owes no duty of care to design a highway project safely where the contractor acts in strict compliance with the governmental entity's specifications. We distinguished between "the duties that may be imposed upon a contractor that has some discretion in performing the contract and a contractor that is left none." [Citing portion of Keller that distinguished Gehring ]. That such a contractor acts as the government and may therefore be entitled to its immunity follows from the same principle.[130]
By the same logic, a contractor in the posture of Gehring would not be "acting as the government," nor entitled to the government's immunity. And the distinction is the same as that identified by the Brown & Gay majority in the "Private Contractors Exercising Independent Discretion" portion of its opinion.
With the foregoing understanding of Brown & Gay and other relevant Texas Supreme Court precedents in mind, we now turn to the record in this case.
IS GTECH BEING SUED FOR ACTING "AS TLC"?
In their live petition, the Steele Plaintiffs seek to recover from GTECH, as "benefit-of-the-bargain" damages, the prize amounts corresponding to their reading of the Game 5 instructions as promising each, based on his or her discovery of a moneybag icon in the 5X BOX, but without need also to win in tic-tac-toe, five times the amount shown in the PRIZE box of the tickets-sums exceeding $500 million in the aggregate-plus exemplary damages. The Steele Plaintiffs expressly "do not contend that their tickets are 'winning tickets,' " and on the contrary concede "that their tickets are 'non-winning' tickets." Instead, they rely on the following causes of action:
• Fraud by misrepresentation and nondisclosure . These causes of action rest upon the contention that GTECH is factually responsible, at least in part, for the wording of the Game 5 instructions. These actions by GTECH, in turn, are alleged to amount to fraud upon the Steele Plaintiffs, either affirmatively or through its silence.
• Aiding and abetting TLC's fraud . This cause of action assumes that TLC is responsible for the Game 5 instructions and committed the asserted fraud through those instructions. The wrong alleged of GTECH is intentionally "assisting" TLC by printing and distributing the Fun 5's tickets, activating the *792 tickets to make them available for sale, and operating the Texas Lottery computer system in a manner that declined to validate the Steele Plaintiffs' tickets as winners.
• Tortious interference with existing contracts . The premise of this cause of action is that a contract was formed between TLC and each of the Steele Plaintiffs when the latter "exchanged $5 of their hard-earned cash for each of their Fun 5's tickets in return for the promise that they would be entitled to receive five times the amount in the Prize Box if their ticket revealed a Money Bag." GTECH "willfully and intentionally interfered" with these contracts, the Steele Plaintiffs maintain, "by using and continuing to use a non-conforming computer program" that omitted their tickets from the list of winning tickets.
• Conspiracy . This cause of action asserts that GTECH and TLC had a "meeting of the minds" to "print misleading and deceptive instructions on Fun 5's tickets, to distribute the misleading and deceptive tickets for sale to lottery players in Texas, and to use GTECH's computer system to validate tickets as non-winners when the clear language of the tickets represented that they should be validated as winning tickets."
The latter three causes of action are founded on alleged acts by GTECH that would merely comply with TLC requirements and directives, and regarding which the relevant contracts left GTECH no discretion to do otherwise.
TLC possesses delegated power to design and sell Texas Lottery tickets and decide winners
As sovereign immunity must ultimately be rooted in the sovereign will, we first note that the design, sale, and distribution of the Fun 5's ticket was within the TLC's delegated powers, as was the determination of winning versus losing tickets. Through a 1991 constitutional amendment, the People of Texas empowered the "Legislature by general law [to] authorize the State to operate lotteries,"[131] and to that end their Legislature enacted the State Lottery Act, currently codified as Chapter 466 of the Government Code.[132] The Lottery Act vests in the TLC and its executive director "broad authority" and the duty to "exercise strict control and close supervision over all lottery games conducted in this state to promote and ensure integrity, security, honesty, and fairness in the operation and administration of the lottery."[133] The TLC is further required to "adopt all rules necessary to administer [the Lottery Act]" and it "may adopt rules governing the establishment and operation of the lottery," including the type of games to be conducted, the price of each ticket, the number of winning tickets, and "any other matter necessary or desirable as determined *793 by the commission, to promote and ensure ... the integrity, security, honesty, and fairness or the operation and administration of the lottery."[134] The Act also specifically charges the executive director with "prescrib[ing] the form of tickets."[135]
The TLC has promulgated rules creating and governing each of several different categories of "Texas Lottery" games. Among these are "instant" or "scratch-off" games, like Fun 5's, which are distinguished by play entailing removal of a thin latex coating that conceals data used to determine eligibility for a prize.[136] The detailed procedures for each Texas Lottery instant game are published in the Texas Register and made available by request to the public.[137] However, the TLC's rules provide globally that a player's eligibility to win a prize in a given game is subject to ticket-validation requirements that include having a "validation number" on the ticket corresponding to the TLC's "official list of validation numbers of winning tickets" for that game.[138]
TLC's delegated power to determine winning versus losing tickets is further enhanced by Lottery Act provisions that deem a player's purchase of a ticket in a particular lottery game to be the player's agreement "to abide by and be bound by the commission's rules, including the rules applicable to the particular lottery game involved."[139] The ticket purchase is similarly deemed to be the player's agreement "that the determination of whether the player is a valid winner is subject to: (1) the [TLC's] rules and claims procedures, including those developed for the particular lottery game involved; and (2) any validation tests established by the [TLC] for the particular lottery game involved."[140] Similarly, the TLC's instant-game rules specify that by ticket purchase, "the lottery player agrees to comply with and abide by Texas law, all rules, procedures, and final decisions of the [TLC], and all procedures and instructions established by the executive director for the conduct of the instant game."[141] Ultimately, an aggrieved instant-game player's recourse against the TLC is confined to the following rule: "If a dispute arises between the [TLC] and a ticket claimant concerning whether the ticket is a winning ticket and if the ticket prize has not been paid, the *794 executive director may, exclusively at his/her determination, reimburse the claimant for the cost of the disputed ticket."[142] "This shall be the claimant's exclusive remedy," the rule emphasizes.[143]
TLC was authorized to contract, and has contracted, with GTECH to assist with these delegated functions
The same constitutional amendment that allowed for State of Texas-run lottery games also empowered the Legislature to "authorize the State to enter into a contract with one or more legal entities that will operate lotteries on behalf of the State."[144] Through the Lottery Act, the Legislature has authorized the TLC's executive director, subject to certain limitations not material here, to "contract with or employ a person to perform a function, activity, or service in connection with the operation of the lottery as prescribed by the executive director."[145] Two such contracts have governed TLC's relationship with GTECH at relevant times: (1) a "Contract for Lottery Operations and Services," dated December 2010, under which GTECH is made the exclusive vendor of what can be summarized as infrastructure and services for the overall operations of Texas Lottery games, including warehousing and distributing games and providing the computer system used to verify winners (the Operations Contract); and (2) a "Contract for Instant Ticket Manufacturing," dated August 7, 2012, under which GTECH, alongside two other vendors that executed similar contracts, is to provide certain goods and services related to development and production of instant games (the Instant-Ticket Contract).[146] The Instant-Ticket contract is ultimately of greater significance to this case.
Under the Instant-Ticket Contract, GTECH is required to provide the TLC "game planning services support" that entails "work[ing] closely with the [TLC] to identify instant ticket games" for potential inclusion in the TLC's "plan" or "plans" of new instant games to be developed and sold. To that end, GTECH "shall provide suggested game designs for inclusion in the plan," including, "at a minimum," (1) "[r]ecommendations for each price point and theme, including the game design and play style, together with an album of representative tickets," and (2) "Game Development Services to include but not be limited to graphic design, game design, artwork, prize structures, and play style." But the TLC "shall make all final decisions regarding the selection and inclusion of instant ticket games in the plan."
Assuming the TLC opts to include a GTECH-proposed game design in the plan, GTECH is to prepare "draft artwork and prize structures" for TLC approval in advance of the game's scheduled launch *795 date, and "shall" provide such materials within five working days upon the TLC's request. If the draft artwork and prize structure are approved by the TLC, GTECH then has five business days in which it "must provide draft working papers to the [TLC]"-essentially a detailed version of the game's parameters and specifications-as well as color proofs of the ticket image, for TLC approval. "Upon review of the draft working papers, the [TLC] will provide requested changes to [GTECH]," following which GTECH "must provide final working papers to the [TLC] within two (2) business days of receipt of the requested changes." "Production of any instant game will not proceed until the [TLC] Executive Director or designee gives written authorization." The "[e]xecuted working papers must be complete and free of any errors." "Any changes made after the execution of working papers must be approved through the execution of a post executed change and signed by the [TLC] Executive Director or designee."
The Instant-Ticket Contract, as well as the Operations Contract, specify that GTECH is providing its services "as an independent contractor and not as an employee or agent of the [TLC]" and further disclaim the creation or implication of any "joint venture, partnership, employer/employee relationship, principal/agent relationship, or any other relationship between the parties." Each contract also requires that GTECH indemnify and hold the TLC harmless against claims or losses arising for or on account of the "works," goods, or services provided as a result of the contract, the former term being defined to include, inter alia , "lottery games, game names, game designs, ticket format and layout, manuals, instructions [and] printed material." Yet both contracts also emphasize that the TLC wields supervisory power over GTECH's work and ultimate control over lottery games and operations. In addition to the TLC's previously-described authority in the development of instant games, both contracts contain a provision stating that:
The Texas Lottery Commission is a part of the Executive Branch of Texas State Government. The [TLC] will not relinquish control over lottery operations. [GTECH] shall function under the supervision of the [TLC]. Its operations will be subject to the same scrutiny and oversight that would apply if all operations were performed by [TLC] employees.
The Instant-Game Contract further provides that "[f]inal decisions regarding the direction or control of the Lottery are always the prerogative of the [TLC] in its sole discretion as an agency of the State of Texas"; that "[a]lthough GTECH comes from the private sector, its operations will be subject to the same scrutiny and oversight that would exist if all operations were performed by [TLC] employees"; and that:
The [TLC] may rely upon the guidance of [GTECH] in all matters related to instant game development and manufacturing services, but reserves the sole right to reject that guidance for any reason. [GTECH], conversely, must accept and support the decision of the [TLC].
GTECH further "warrants and agrees" under the Instant-Ticket Contract "that its tickets, games, goods and services shall in all respects conform to, and function in accordance with, [TLC]-approved specifications and designs."
Most of the causes of actions complain substantively of underlying TLC decisions and directives and not GTECH's exercise of independent discretion
As previously noted, the Steele Plaintiffs' causes of action for aiding and *796 abetting fraud and conspiracy presume that TLC deliberately chose the allegedly misleading Game 5 instructions so as to mislead and harm them. If so, GTECH had no power under the Instant-Game Contract to countermand TLC's decision-rather, the contract expressly reserved to TLC "the sole right to reject [GTECH's] guidance for any reason" and obligated GTECH to "accept and support" TLC's decision. More critically, the gravamen of the alleged "aiding and abetting fraud" and participation in "conspiracy" by GTECH is that GTECH performed its contractual obligations to print and distribute Fun 5's and program game parameters into the Texas Lottery computer system once TLC had determined or approved the game design. GTECH had no discretion to do otherwise-instead, it was obligated to conform "its tickets, games, goods, and services" in accordance with TLC's specifications and designs. The same is true of the GTECH conduct made the basis of the Steele Plaintiffs' tortious-interference cause of action-GTECH's programming of the computer system in accordance with the game parameters, as GTECH was required to do under its contracts with TLC.
As such, the Steele Plaintiffs' causes of action for aiding and abetting fraud, tortious interference, and conspiracy each complain substantively of underlying decisions or directives of TLC, not any actions by GTECH within its independent discretion, thereby implicating sovereign immunity. But the analysis is more complicated with respect to the Steele Plaintiffs' remaining causes of action for fraud by misrepresentation or silence.
But the "fraud" causes of action complain, in part, of alleged GTECH acts within its independent discretion
The Steele Plaintiffs' fraud causes of action hinge on the assertion that GTECH rather than TLC is to blame, at least in part, for the complained-of features of the Game 5 instructions. The parties largely agree, at least factually, regarding the sequence of events that yielded the Fun 5's game in the form sold at retail. The concept of the Fun 5's game originated with GTECH, which had previously sold similar games to several other state lotteries, with much financial success and apparently no consumer complaints. In March 2013, GTECH presented TLC staff with a prototype closely resembling a game that GTECH had sold to the Nebraska state lottery. The Commission had opted to include this game design in its plan for new instant games, initially anticipating sale during the 2014 fiscal year.
Subsequently, in April 2014, GTECH personnel emailed artwork and draft working papers for the Fun 5's game to TLC staff. At this stage, the physical appearance of the game ticket, including Game 5, already had many similarities to that of the finished product, with the differences consisting of an omitted apostrophe in the name (the working title was "Fun 5s" rather than the eventual "Fun 5's"), different icons used in Game 5,[147] and similar matters of form or style. Aside from references to the different icons being used at the time, the Game 5 instructions printed on the ticket-the eventual center of controversy-were substantively identical to those eventually appearing in the finished product. Within the month of April, TLC staff sent GTECH two rounds of comments, in the form of handwritten edits made to the artwork and working papers, making the changes that would yield the final version of the ticket image. The sole change made to the Game 5 instructions, *797 aside from modifying the icons being referenced, was to delete a single word, "line," that did not impact meaning. GTECH incorporated these changes into a revised version of the artwork and working papers and sent them to TLC.
A subsequent round of comments from TLC staff was addressed specifically to the game parameters GTECH had set forth in the working papers. From their inception, GTECH's working papers had specified parameters for Game 5 that included-consistent with the product ultimately sold at retail-limiting prize eligibility solely to tickets having three play symbols in a row in tic-tac-toe, with the multiplier icon serving only to increase the size of a tic-tac-toe winner's prize. However, GTECH had included additional parameters specifying that the prize-multiplier icon in Game 5 would appear only on the tickets having winning tic-tac-toe combinations. Had these parameters survived, they would have ensured that no Fun 5's contestant could uncover a prize-multiplier icon on a non-winning ticket-or profess resultant confusion about his or her entitlement to a prize, as the Steele Plaintiffs now do.
But TLC staff objected through comments transmitted on May 12, stating that "Money Bag play symbol needs to appear on non-winning tickets also." In a cover email, staff explained that having the moneybag symbol appear only on winning tickets in Game 5 would render that game "an easy target for micro-scratching" because a wrongdoer would need only look for the moneybag icon in the 5X BOX "to know that it is a winner." In response, during the morning of May 14, GTECH transmitted a revised version of the working papers that simply deleted its prior parameters specifying that the moneybag icon would appear only on winning tickets, but did not state affirmatively that the icon would appear on non-winning tickets or indicate how often this would occur. Later that morning, TLC staff (by now, Dale Bowersock, TLC's Instant Product Coordinator) replied, "In Game 5 we need the parameter to state that the Moneybag 5x multiplier symbol will be used on non-winning tickets as well as winning tickets. I don't see where this concern was addressed." Bowersock later elaborated, "What we are looking for is a parameter that is very clearly defined, such as 'The 'MONEY BAG' Play Symbol will appear in the 5X Box in approximately [redacted] of the tickets with non-winning combinations in GAME 5."
Within the day, GTECH revised the working papers again, adding a new parameter tracking Bowersock's language and specifying that the moneybag symbol "will appear in the 5X Box in approximately 25% of the tickets with non-winning combinations in GAME 5." So revised, and with no further changes to any of the other features of the game, GTECH submitted the working papers to the TLC. Consequently, this revised version of the Fun 5's working papers incorporated (1) the new Game 5 parameters, originating with TLC, specifying that the moneybag-prize-multiplier icon would appear on both winning tickets and 25 percent of the non-winning tickets, in combination with (2) the preexisting Game 5 instructions, whose substance had originated with GTECH and had accompanied GTECH's previously proposed game parameters in which the moneybag icon could appear only on winning tickets. This version of the working papers was approved by the TLC's executive director, executed, and made the basis for the Fun 5's ticket sold at retail.
* * *
The essence of GTECH's immunity arguments, as they relate to the fraud causes of action, is that it is being sued merely for implementing TLC's decision or directive *798 to change the Game 5 parameters to have moneybag icons appear on non-winning tickets. The Fifth Court of Appeals relied on this same basic rationale in affirming the dismissal in Nettles .[148] But as the Steele Plaintiffs urge, the posture of the case presented to this Court is not quite so straightforward.
It is true, as GTECH urges, that the Steele Plaintiffs' fraud causes of action (and indeed all of their causes of action) are predicated factually on the presence of moneybag icons on non-winning tickets and that this feature was an alteration of Game 5's original proposed parameters that GTECH made at TLC's behest. To the extent the Steele Plaintiffs maintain that GTECH had discretion simply to refuse to make this parameter change, that view is contrary to the Instant-Game Contract, which required GTECH instead to conform to TLC's specifications and to support TLC's instant-game decisions. As if recognizing as much, the Steele Plaintiffs pleaded in their live petition that they "do not complain of the change in parameters requested by the TLC"-their focus, rather, is "the misleading and deceptive wording chosen for the Fun 5's tickets by GTECH in the exercise of its independent discretion." But while GTECH dismisses the distinction as mere "artful pleading," it remains that the Steele Plaintiffs are not complaining merely of the appearance of moneybag icons on non-winning tickets, but that this feature of Game 5 misled and injured the Steele Plaintiffs when combined with the accompanying instructions. Further, as the predicate for their fraud causes of action, the Steele Plaintiffs assert that the source of the instructions part of the mix was GTECH decisions made within its independent discretion, not decisions or directives from TLC. Consequently, the fraud causes of action cannot fairly be characterized as complaining solely of GTECH's implementation of TLC's chosen parameters. Although the parameter change by TLC could potentially become relevant to causation, proportionate responsibility, or other issues going to the merits of the Steele Plaintiffs' fraud causes of action, they would not singularly negate jurisdiction to adjudicate those causes of action. Instead, we must proceed to consider the scope of GTECH's contractual discretion in regard to the Game 5 instructions.
GTECH asserts that the "undisputed" evidence demonstrates that it possessed no independent discretion regarding the wording of the Game 5 instructions. It emphasizes that the Instant-Ticket Contract reserved to the TLC ultimate control over the product's form and design and required GTECH to comply with TLC's specifications, "not the other way around." GTECH similarly observes, correctly, that it lacked power or discretion under its contracts to implement game instructions or features unilaterally and instead operated under TLC's supervision and subject to the agency's approval. But the relevant contracts also disclaimed any employment, agency, or "any other relationship between" TLC and GTECH-instead, GTECH was explicitly an "independent contractor" with respect to the goods and services it provided, a term denoting TLC control only as to the end product or result of GTECH's work.[149] And TLC's right of *799 ultimate control or approval of GTECH's work cannot alone be the controlling determinant of immunity-Brown & Gay's work was also subject to the approval of its governmental principal,[150] yet the Texas Supreme Court held it to have independent discretion, and thus no immunity, regarding the traffic designs and layouts it had fashioned prior to that approval.[151] A contrary view would effectively resurrect the pre- Gehring "accepted work" doctrine in the guise of an immunity principle.[152]
Instead, we must proceed farther to examine the scope of GTECH's discretion in fashioning the Game 5 instructions prior to TLC's ultimate approval. In essence, we must inquire whether, on this record, viewed through our standard of review, GTECH's role in developing the Game 5 instructions was analogous to (1) the contractor in Keller , merely complying with TLC specifications without discretion to do otherwise, such that it effectively acted "as TLC"; or was (2) more like the contractors in Brown & Gay and Gehring , or the investment advisor in K.D.F. , possessing discretion in fashioning Game 5 instructions for TLC that it could have exercised so as to refrain from its acts now alleged to constitute fraud.
While reserving to TLC ultimate control and final approval over the design and form of instant games, the Instant-Game Contract inescapably granted wide discretion *800 to GTECH in determining such details in the work it submitted for TLC's approval. The TLC-GTECH relationship, as the Steele Plaintiffs observe, was not one "where TLC set out specific parameters dictating the type of game it want[s] and the language, artwork, and design to be selected for the game." Instead, the contract contemplated that GTECH would have broad creative leeway in fashioning for TLC approval, as opposed to acting "as TLC" in effectuating agency decisions already made, the myriad details of "Game Development Services" (which "include but [are] not ... limited to graphic design, game design, artwork, prize structures, and play style"), "draft artwork and prize structures," and "draft working papers." And the Steele Plaintiffs presented evidence, presumed true in the posture of this appeal, confirming that this was how TLC and GTECH operated in practice in regard to the game instructions printed on tickets. This evidence included the deposition testimony of the TLC's executive director, Gary Grief, who explained that the agency "do[es] rely" on GTECH and other instant-game vendors, "at least as a starting point, when we're looking at language that goes on tickets," as "[t]hey've got the experience in the industry."
GTECH counters that any discretion it could have possessed in originating the Fun 5's game and Game 5 instructions has no bearing on its immunity in this case. GTECH again emphasizes TLC's intervening parameter change to add moneybag icons to non-winning tickets, urging that the Steele Plaintiffs are in essence suing it over a different Game 5 than the Game 5 it had originally proposed. GTECH makes a valid point-had TLC approved GTECH's original version of Game 5, moneybag icons would have appeared only on winning tickets, and that is not the Game 5 of which the Steele Plaintiffs now complain. Consequently, we agree with GTECH that its discretion in originating the Fun 5's game and Game 5 instructions is ultimately immaterial to its claim of derivative sovereign immunity against the fraud causes of action asserted by the Steele Plaintiffs. But GTECH's origination of the game and Game 5 instructions is not the Steele Plaintiffs' primary focus.
The Steele Plaintiffs' core focus, rather, is GTECH's acts or omissions once TLC directed the change in the Game 5 parameters to add moneybag icons to non-winning tickets. The primary root of GTECH's fraud liability, the Steele Plaintiffs reason, is GTECH's failure or refusal to alert TLC that the parameter change, in combination with the preexisting wording of the Game 5 instructions , would cause the instructions to be misleading to Fun 5's purchasers who uncovered moneybag icons on non-winning tickets. And GTECH had independent discretion to alert TLC to the potential problem, the Steele Plaintiffs continue, if not an affirmative duty to do so. Accordingly, the Steele Plaintiffs conclude, GTECH enjoys no sovereign immunity against their fraud causes of action.
GTECH insists that its contracts left it no discretion to alert TLC to any such perceived problem with the instructions, further portraying the Steele Plaintiffs' argument as confirming that their suit complains only of GTECH's compliance with TLC's directives. From the same premise, GTECH urges that the Steele Plaintiffs "would effectively bring[ ] contractor immunity in Texas to an end" by permitting suits founded on contractor "discretion" to disregard or "second-guess" the government's directives. But contractor immunity in a given case turns on the particular contracts and facts involved, and GTECH's premise is valid only if, upon receiving TLC's directive to add moneybag icons to non-winning Game 5 tickets, GTECH had *801 no discretion but to implement the change without attempting to revisit with TLC the potential need for conforming changes to the preexisting proposed Game 5 instructions.
In insisting this discretion was lacking, GTECH suggests that TLC had already finalized and approved the Game 5 instructions by the time TLC prescribed the change in game parameters. GTECH emphasizes that TLC staff had previously made edits to the Game 5 instructions and artwork that GTECH had already incorporated into the Fun 5's working papers. But GTECH overreaches in assuming that the Game 5 instructions, in that preexisting form, were already fixed and immutable when TLC directed the change in Game 5 parameters, amounting to TLC specifications and directives with which GTECH had no discretion but to comply without reservation or further comment. On the contrary, the controlling act of finalization under the Instant-Game Contract was approval and execution of the final working papers by TLC's executive director-and this event had not yet occurred when TLC directed the parameter change. Further, the Contract contemplated that GTECH could propose further changes to working papers not only at that pre-approval juncture, but even for a period afterward, explicitly permitting "changes made after the execution of working papers ... through the execution of a post executed change and signed by the [TLC] Executive Director or designee."
And the Steele Plaintiffs presented evidence that GTECH and TLC actually operated in this manner under the Instant-Game Contract. Joseph Lapinski, GTECH's account-development manager regarding the Texas Lottery, acknowledged that if GTECH personnel "saw a change come through from [TLC] [that they] anticipated or believed ... would harm the game or [TLC]," GTECH would expect them to "either say something to [TLC]" or "let someone know so ... we can discuss or address it with [TLC]." Lapinski termed this expectation of GTECH employees "professionalism" and "good customer service." Likewise, Bowersock, the TLC instant-game coordinator, echoed the expectation that "[i]f [GTECH] saw concerns with the game they would report it to us."
Furthermore, the GTECH personnel having primary responsibility over the Fun 5's working papers and their various revisions confirmed not only that GTECH had the opportunity to alert TLC to potential problems with the Game 5 instructions after the parameter change, but also made a conscious decision to forego raising any such concerns with TLC. Laura Thurston, a GTECH customer-service representative who prepared the final rounds of revised working papers, including those implementing the parameter change, testified that a parameter change from TLC triggered a "comprehensive[ ]" internal review by the GTECH "teams" who were impacted by the change to determine if further changes to the game-including the instructions-were warranted. Thurston recounted that following the parameter change, she "did the examination" of the Game 5 instructions and also "had this examined by software [personnel]." Thurston "felt that [the instruction language] was clear" and accordingly "did not consider changing the language." The second GTECH customer-service representative, Penelope Whyte, had drafted the original version of the Fun 5's working papers but had been away from the office when Thurston made the final changes. Whyte echoed Thurston's understanding of GTECH's prerogative to suggest further changes in light of an intervening parameter change, acknowledging that these were "part of my job" as a customer-service representative *802 and "also part of [GTECH's] internal review." She also recounted that upon her return to work, she had "looked at the instructions" and, like Thurston, "saw that they didn't need to be changed."
By deciding not to revisit the Game 5 instructions with TLC after the agency prescribed the parameter change, GTECH, the Steele Plaintiffs insist, violated their obligation under the Instant-Game Contract to provide TLC "[e]xecuted working papers" that are "complete and free of any errors."[153] But we need not decide whether GTECH contracts affirmatively required it (i.e., deprived it of discretion not to act) to alert TLC to a perceived discrepancy with the Game 5 instructions at that juncture. Rather, the consideration controlling GTECH's immunity is whether its contracts left it discretion to choose to so alert TLC. Consistent with the conduct and understanding of GTECH's Thurston and Whyte, the contracts plainly afforded GTECH that discretion. While it remained TLC's prerogative to reject GTECH's guidance, GTECH possessed discretion to provide the guidance nonetheless. In this limited respect, GTECH's position is that of the government contractors in Brown & Gay and Gehring rather than that of Keller , and perhaps most closely resembles the investment advisor in K.D.F.[154]
Beyond this, GTECH disputes whether or how this exercise of discretion not to revisit the Game 5 instructions with TLC could actually amount to fraud or otherwise breach any cognizable tort duty. Similarly, GTECH appears to question the extent of any legal injury or damage to the Steele Plaintiffs, pointing out the Lottery Act provisions and rules deeming ticket purchases to be the buyer's agreement "to abide by and be bound by" the commission's rules and validation processes, including rules limiting their remedy-at least against TLC-merely to a refund of the $5 purchase price of each ticket.[155] Whatever the validity of GTECH's concerns (and we intend no comment), they go beyond the limited jurisdictional inquiry currently before us. It is true that if a government contractor's contract would leave it no discretion to comply with an asserted tort duty, that feature may both establish the existence of derivative immunity and negate the existence of the tort duty, as Chief Justice Hecht observed in the Brown & Gay concurrence.[156] To this extent, the jurisdictional inquiry may overlap the merits, and this would neither prevent nor excuse courts from addressing the scope of contractual discretion to the extent necessary to resolve the jurisdictional issue.[157] But if, as here, the court *803 determines that the relevant contracts would leave the government contractor discretion to comply with the asserted tort duty and avoid the conduct alleged to be wrongful, there is no derivative immunity and the jurisdictional inquiry is at end. Our own jurisdiction here extends no farther, as the purpose of the plea to the jurisdiction GTECH has asserted, and that is the sole focus of this appeal, "is not to force the plaintiffs to preview their case on the merits but to establish a reason why the merits of the plaintiffs' claims should never be reached."[158]
DOES BROWN & GAY 'S "RATIONALE AND PURPOSE" ANALYSIS OTHERWISE AID GTECH?
One additional contention by GTECH remains to be addressed, however. Although GTECH's primary position is that it is being sued solely for complying with underlying TLC directives-i.e., acting "as TLC" and not within its own independent discretion-and need not make any further showing in order to enjoy TLC's sovereign immunity, it argues in the alternative that the fiscal justifications addressed in the "Rationale and Purpose" portion of the Brown &Gay opinion[159] would independently justify the application or extension of that immunity to it here. We consider this argument with respect to the portion of the Steele Plaintiffs' fraud cause of action that we have held to survive the jurisdictional analysis under GTECH's primary rationale.
In support of this alternative argument, GTECH posits that "[i]n the unlikely event that Plaintiffs' fraud claims were ultimately upheld," "adverse publicity" from the judgment would "tarnish the excellent reputation of the Texas Lottery, causing ticket sales to decline," such that "the State will be forced to make unforeseen expenditures to cover the shortfall, largely in the area of education," the chief beneficiary of Texas Lottery revenues. But a similar argument could have been made in Brown & Gay -a judgment against the contractor for negligently designing toll-road signs and traffic layouts, proximately causing a fatal wrong-way collision, would tend to fuel a perception of dangerousness dissuading toll-road use, potentially requiring unforeseen shifts in governmental expenditures to make up for the resultant drop in revenue. For that matter, such secondary or tertiary effects on government and its functions could often be expected to flow from a judgment against a government contractor, not to mention one against a government agent or employee, with the latter arguably tending to have the greater potential negative impact. Nevertheless, the Texas Supreme Court has never extended sovereign immunity to governmental employees or agents acting within their individual as opposed to official capacities-on the contrary, such persons "have always been individually liable for their own torts, even when committed in the course of employment."[160] And Brown & Gay , as we have seen, stands for the parallel proposition that the "rationale and purpose" of sovereign immunity would support recognition of immunity for government contractors only to the extent the suit complains of what are substantively underlying acts, directives, or decisions of the government-i.e. in essence a species of suit seeking to control state action through the contractor-and not the contractor's *804 exercise of independent discretion.
To the extent GTECH is advocating a novel expansion of sovereign immunity to its benefit, this intermediate appellate court must instead adhere to the existing parameters of Texas sovereign-immunity doctrine unless and until the Texas Supreme Court instructs us otherwise.[161] And in the absence of such developments, GTECH has not shown that the Steele Plaintiffs' fraud causes of action, to the extent they complain of GTECH's actions following the Game 5 parameter change, implicate TLC's sovereign immunity.
CONCLUSION
The district court did not err in denying GTECH's plea to the jurisdiction with respect to the Steele Plaintiffs' fraud causes of action to the extent they are predicated on GTECH's failure or refusal, following TLC's change in the Game 5 parameters to have moneybag icons appear on non-winning tickets, to raise with TLC the now-complained-of asserted discrepancy between the Game 5 instructions and actual parameters. We emphasize again that the merits of these causes of action are not before us in this appeal, which concerns only immunity and jurisdiction. However, in its other components, the Steele Plaintiffs' suit implicates sovereign immunity by substantively seeking to control the actions and decisions of TLC within its delegated authority. As the Steele Plaintiffs can point to no legislative waiver of this immunity, the district court lacks subject-matter jurisdiction to adjudicate these portions of their suit. To this extent, we reverse the district court's order and render judgment dismissing the causes of action for want of subject-matter jurisdiction.

The ticket's actual dimensions were 8 inches by 4 inches.

To be precise, both GTECH and a former affiliate, GTECH Printing Corporation, were involved in the underlying events, but GTECH later succeeded to the interests of the affiliate. Furthermore, following the merger of its corporate parent with the International Game Technology company, GTECH has become known as "IGT Global Solutions Corporation." Because the parties have continued to identify the relevant entity simply as "GTECH," so have we.

See, e.g. , State v. Lueck , 290 S.W.3d 876, 880 (Tex. 2009) ("The State and other state agencies ... are immune from suit and liability in Texas unless the Legislature expressly waives sovereign immunity." (citing Texas Dep't of Transp. v. City of Sunset Valley , 146 S.W.3d 637, 641 (Tex. 2004) )).

The parties have referred to this concept in terms of "derivative governmental immunity," but such a derivation from TLC's immunity would more precisely be a form of the sovereign immunity that clothes the State of Texas and its agencies. See , e.g. , Wasson Interests, Ltd. v. City of Jacksonville , 489 S.W.3d 427, 429-30 (Tex. 2016) (explaining that "governmental immunity" is the derivative form of sovereign immunity that may extend to "[p]olitical subdivisions of the state[,] such as counties, municipalities, and school districts"). Although most of our observations would apply to both forms, we describe the parties' contentions in terms of sovereign immunity rather than governmental immunity, consistent with their substance, because the distinction ultimately has some conceptual significance in our analysis.

See generally Nettles v. GTECH Corp. , No. 05-15-01559-CV, 2017 WL 3097627 (Tex. App.-Dallas July 21, 2017, no pet. h.) (mem. op.).

GTECH first filed a notice of appeal under color of Civil Practice and Remedies Code Section 51.014, Subsection (a)(8), the provision authorizing "[a] person [to] appeal from an interlocutory order of a district court ... that ... grants or denies a plea to the jurisdiction by a governmental unit as that term is defined in Section 101.001." Tex. Civ. Prac. & Rem. Code § 51.014(a)(8) ; see also Texas A & M Univ. Sys. v. Koseoglu , 233 S.W.3d 835, 844 (Tex. 2007) (holding that government official sued in official capacity can appeal, via Section 51.014(a)(8), denial of official's plea to the jurisdiction, as "the official is invoking the sovereign immunity from suit held by the government itself"). Subsequently, the district court amended its order to add the predicates for a permissive appeal from its denial of GTECH's plea, with the requisite "controlling question of law" being "GTECH Corporation's entitlement to derivative [sovereign] immunity." See Tex. Civ. Prac. & Rem. Code § 51.014(d) ("On a party's motion or on its own initiative, a trial court in a civil action may, by written order, permit an appeal from an order that is not otherwise appealable if: (1) the order to be appealed involves a controlling question of law as to which there is a substantial ground for difference of opinion; and (2) an immediate appeal from the order may materially advance the ultimate termination of the litigation."), (f) (authorizing court of appeals to "accept an appeal permitted by Subsection (d)" upon timely application). Upon GTECH's application, which the Steele Plaintiffs did not oppose, we accepted its appeal of the amended order. See GTECH Corp. v. Steele , No. 03-16-00172-CV, 2016 WL 1566886 (Tex. App.-Austin Apr. 15, 2016) (order). Because we possess jurisdiction through Subsection (f) to review the district court's order on the dispositive question of derivative sovereign immunity, we need not decide whether we also do so under Subsection (a)(8).

See, e.g. , Houston Belt & Term. Rwy Co. v. City of Hous. , 487 S.W.3d 154, 160 (Tex. 2016).

See , e.g. , Texas Parks & Wildlife Dep't v. Miranda , 133 S.W.3d 217, 226 (Tex. 2004) ; Ex parte Springsteen , 506 S.W.3d 789, 798 n.50 (Tex. App.-Austin 2016, pet. denied) (citing City of Elsa v. Gonzalez , 325 S.W.3d 622, 625 (Tex. 2010) (per curiam)); see also Creedmoor-Maha Water Supply Corp. v. Texas Comm'n on Envtl. Quality , 307 S.W.3d 505, 515-16 & nn.7 & 8 (Tex. App.-Austin 2010, no pet.) (emphasizing that facts, not merely legal conclusions, are required).

See, e.g. , Miranda , 133 S.W.3d at 226-27.

See id. at 227-28 (describing the jurisdictional analysis where jurisdictional facts overlap the merits, and noting that it "generally mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c)"). To the extent the evidence pertains to any material jurisdictional facts that are not intertwined with the merits, we would infer that the district court found those in the Steele Plaintiffs' favor. See Vernco Constr., Inc. v. Nelson , 460 S.W.3d 145, 149 (Tex. 2015) (per curiam) ("When a jurisdictional issue is not intertwined with the merits of the claims, which is the case here, [which involved a standing issue,] disputed fact issues are resolved by the court, not the jury."); Worford v. Stamper , 801 S.W.2d 108, 109 (Tex. 1990) (per curiam) (in absence of written findings of fact and conclusions of law, "[i]t is ... implied that the trial court made all the findings necessary to support its judgment"). In that event, GTECH could overcome those implied findings and obtain an appellate judgment of dismissal only by establishing or negating the existence of contrary material jurisdictional facts as a matter of law through conclusive evidence. See City of Keller v. Wilson , 168 S.W.3d 802, 815-17 (Tex. 2005) (explaining that conclusive evidence is the converse of no evidence and affirmatively establishes a fact as a matter of law); Dow Chem. Co. v. Francis , 46 S.W.3d 237, 241 (Tex. 2001) ("When a party attacks the legal sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue."). "Evidence is conclusive only if reasonable people could not differ in their conclusions, a matter that depends on the facts of each case." City of Keller , 168 S.W.3d at 816 (footnote omitted).

See Keller , 168 S.W.3d at 807 ; Miranda , 133 S.W.3d at 228.

Wasson , 489 S.W.3d at 431 (quoting Hosner v. De Young , 1 Tex. 764, 769 (1847) ).

See , e.g. , Brown & Gay Eng'g, Inc. v. Olivares , 461 S.W.3d 117, 121 (Tex. 2015) ; see also Engelman Irrigation Dist. v. Shields Bros. Inc. , 514 S.W.3d 746, 750-53, 754-55 (Tex. 2017) (explaining nature of this jurisdictional impediment and that it operates prior to a judgment becoming final for appellate purposes). Sovereign immunity also encompasses an immunity from liability that is an affirmative defense to the enforcement of a judgment. See, e.g. , Brown & Gay , 461 S.W.3d at 121. Consistent with the posture of this appeal, our subsequent references to "sovereign immunity" are intended to denote the immunity-from-suit aspect.

See, e.g. , Miranda , 133 S.W.3d at 225-26 (citing Texas Dep't of Transp. v. Jones , 8 S.W.3d 636, 637 (Tex. 1999) ).

See Brown & Gay , 461 S.W.3d at 120-29 (addressing whether private engineering firm had shown itself entitled to claim immunity derived from that of toll road authority, a governmental body); Lenoir v. U.T. Physicians , 491 S.W.3d 68, 77-90 (Tex. App.-Houston [1st Dist.] 2016, pet. denied) (op. on reh'g) (addressing whether clinic had shown itself entitled to claim sovereign immunity either as a governmental unit in itself or by virtue of immunity derived from a governmental entity); cf. Lubbock Cty. Water Contr. & Imp. Dist. v. Church & Akin , 442 S.W.3d 297, 305 (Tex. 2014) ("The Water District had the burden, in its plea to the jurisdiction, to establish that it is a governmental entity entitled to governmental immunity. Once it satisfied that burden, the burden shifted to [the claimant] to establish, or at least raise a fact issue on, a waiver of immunity.").

461 S.W.3d 117.

Id. at 124.

See ids="6865844" index="32" url="https://cite.case.law/sw3d/461/117/#p121">id. at 119.

See id. (citing Tex. Transp. Code § 431.066(b) (authorizing local government corporations to retain "engineering services required to develop a transportation facility or system")).

See id.

See id. at 120.

See id.

See id.

See id. at 120, 123-24, 126-27.

See id. at 122.

Id. at 122-23.

See infra note 68.

Id. at 123.

See id.

See id. In fact, as the court emphasized, Brown & Gay's contract had required it maintain insurance for the project, including workers' compensation, commercial general liability, automobile liability, umbrella excess liability, and professional liability. See id. at 119-20.

Id. at 123.

Id. (citing Texas Dep't of Transp. v. Sefzik , 355 S.W.3d 618, 621 (Tex. 2011) (per curiam); Texas Nat. Res. Conserv.Comm'n v. IT-Davy , 74 S.W.3d 849, 853 (Tex. 2002) ).

Id.

Id. at 124.

See id. at 124-27.

309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940).

See ids="6136738" index="54" url="https://cite.case.law/us/309/18/">id. at 20, 60 S.Ct. 413.

Id.

Id. at 20-21, 60 S.Ct. 413.

See ids="6136738" index="59" url="https://cite.case.law/us/309/18/">id. at 21, 60 S.Ct. 413.

See Campbell-Ewald Co. v. Gomez , --- U.S. ----, 136 S.Ct. 663, 672-73, 193 L.Ed.2d 571 (2016).

See Brown & Gay , 461 S.W.3d at 124-25 & n.9 (discussing Butters v. Vance Int'l, Inc. , 225 F.3d 462, 464-66 (4th Cir. 2000) ; Bixby v. KBR, Inc. , 748 F.Supp.2d 1224, 1242 (D. Or. 2010) ); see also ids="4261889" index="66" url="https://cite.case.law/f-supp-2d/748/1224/#p1242">id. at 125 & n.8 (discussing Ackerson v. Bean Dredging Corp. , 589 F.3d 196, 206-07 (5th Cir. 2009), while acknowledging that the Fifth Circuit had concluded that "the contractors' entitlement to dismissal was not jurisdictional").
In Butters , as the Brown & Gay court explained, a female employee of a private security firm hired by the Saudi Arabian government had sued the firm for discrimination after being declined a favorable assignment on orders of the Saudi government. See id. at 124 (citing Butters , 225 F.3d at 464-65 ). The Saudi government was held immune from suit under the Foreign Sovereign Immunities Act, and this immunity was held also to attach to the security firm, as the firm "was following Saudi Arabia's orders not to promote [the employee]." See id. at 124-25 (citing Butters , 225 F.3d at 465-66 ). The Fourth Circuit had also acknowledged the converse proposition, as the Brown & Gay court pointed out-the firm would not have been entitled to this "derivative immunity" had the firm rather than the sovereign made the decision to decline the promotion. See id. at 125 (citing Butters , 225 F.3d at 466 ).
In Ackerson , as the Brown & Gay court explained, federal contractors were sued for damages caused by dredging in connection with a federal public works project. See id. (citing Ackerson , 589 F.3d at 206-10 ). Relying on Yearsley , the Fifth Circuit "held that the contractors were entitled to immunity," as the supreme court described it, where the plaintiffs' allegations had merely " 'attack[ed] Congress's policy of creating and maintaining the [project], not any separate act of negligence by the Contractor Defendants. ' " Id. (quoting Ackerson , 589 F.3d at 207 (emphasis added)).

Id. at 125 n.9 (quoting Bixby , 748 F.Supp.2d at 1242 ). The Brown & Gay court also distinguished these concepts from the federal qualified-immunity doctrine and the Texas official-immunity doctrine, maintaining that these embodied underlying policies that "are simply irrelevant" to Texas sovereign-immunity doctrine. See id. at 127-29.

Id. at 124.

See id. at 125 (discussing Glade v. Dietert , 156 Tex. 382, 295 S.W.2d 642 (1956) ).

Glade , 295 S.W.2d at 643.

See itation index="84" url="https://cite.case.law/citations/?q=16%20Tex.%20Admin.%20Code%20%C2%A7%20401.302">id.

See itation index="85" url="https://cite.case.law/citations/?q=16%20Tex.%20Admin.%20Code%20%C2%A7%20401.302">id.

See itation index="86" url="https://cite.case.law/citations/?q=16%20Tex.%20Admin.%20Code%20%C2%A7%20401.302">id.

See itation index="87" url="https://cite.case.law/citations/?q=16%20Tex.%20Admin.%20Code%20%C2%A7%20401.302">id.

Id.

See itation index="89" url="https://cite.case.law/citations/?q=16%20Tex.%20Admin.%20Code%20%C2%A7%20401.302">id.

Id. at 644.

See itation index="91" url="https://cite.case.law/citations/?q=16%20Tex.%20Admin.%20Code%20%C2%A7%20401.302">id.

See Brown & Gay , 461 S.W.3d at 125 ; see also Steele v. City of Hous. , 603 S.W.2d 786, 791 (Tex. 1980) ("The [Texas] Constitution itself is the authorization for compensation for the destruction of property and is a waiver of governmental immunity for the taking, damaging or destruction of property for public use.").

Brown & Gay , 461 S.W.3d at 125.

878 S.W.2d 589 (Tex. 1994).

See ids="10011869" index="96" url="https://cite.case.law/sw2d/878/589/">id. at 596.

See ids="10011869" index="97" url="https://cite.case.law/sw2d/878/589/">id. at 596-97.

Id. at 597 ; see ids="10011869" index="99" url="https://cite.case.law/sw2d/878/589/">id. at 591.

Id. at 597 ; see ids="10011869" index="101" url="https://cite.case.law/sw2d/878/589/">id. at 591.

Brown & Gay , 461 S.W.3d at 124.

Id.

See id. at 126-27 (discussing Ross v. Linebarger, Goggan, Blair & Sampson, L.L.P. , 333 S.W.3d 736 (Tex. App.-Houston [1st Dist.] 2010, no pet.) ; Foster v. Teacher Ret. Sys. , 273 S.W.3d 883 (Tex. App.-Austin 2008, no pet.); City of Hous. v. First City , 827 S.W.2d 462 (Tex. App.-Houston [1st Dist.] 1992, writ denied) ).

Ross and First City had involved suits against law firms arising from their tax-collection work on behalf of governmental entities. The firms were held entitled to the government's immunity under the premise that they had been sued in their official capacities as agents for the government. See Ross , 333 S.W.3d at 742-43 ; First City , 827 S.W.2d at 479-80. "Regardless of whether these cases were correctly decided," the Brown & Gay court reasoned,
the government's right to control that led these courts to extend immunity to a private government contractor is utterly absent here. The evidence shows that Brown & Gay was an independent contractor with discretion to design the Tollway's signage and road layouts. We need not establish today whether some degree of control by the government would extend its immunity protection to a private party; we hold only that no control is determinative.
Brown & Gay , 461 S.W.3d at 126. As for Foster , that case had involved a suit by a retired teacher against the Teacher Retirement System of Texas and Aetna, the administrator of TRS's health-insurance plan for retired teachers, complaining of a denial of coverage for a claim. The Brown & Gay court observed that Aetna's sole role had been to act "as an agent of and in a fiduciary capacity for" TRS in the administration of a state-funded health insurance plan and, further, had been indemnified by TRS for any actions arising from its good-faith performance. See ids="6865844" index="111" url="https://cite.case.law/sw3d/461/117/#p121">id. at 127 (citing Foster , 273 S.W.3d at 889-90 ). By contrast, the supreme court observed, "no fiduciary relationship exists between Brown & Gay and the Authority," and "the Olivareses do not effectively seek to recover money from the government." Id.

And because we agree with GTECH's view of the governing standard, we need not decide whether, as GTECH insists, appellees waived reliance on their competing version of the standard by failing to argue it before the district court. But cf. Rusk State Hosp. v. Black , 392 S.W.3d 88, 94-95 (Tex. 2012) (clarifying that jurisdictional aspects of sovereign immunity include susceptibility to being addressed for the first time on appeal).

The Steele Plaintiffs point out that at the conclusion of the Brown & Gay court's discussion of "Private Contractors Exercising Independent Discretion," it returned to an explicit emphasis on sovereign immunity's "Rationale and Purpose":
In sum, we cannot adopt Brown & Gay's contention that it is entitled to share in the Authority's sovereign immunity solely because the Authority was statutorily authorized to engage Brown & Gay's services and would have been immune had it performed those services itself. That is, we decline to extend to private entities the same immunity the government enjoys for reasons unrelated to the rationale that justifies such immunity in the first place. The Olivareses' suit does not threaten allocated government funds and does not seek to hold Brown & Gay merely for following the government's directions. Brown & Gay is responsible for its own negligence as a cost of doing business and may (and did) insure against that risk, just as it would had it contracted with a private owner.
Brown & Gay , 461 S.W.3d at 127. Similarly, the Steele Plaintiffs observe, the court went on to close its opinion by "declin[ing] to extend sovereign immunity to private contractors based solely on the nature of the contractor's work when the very rationale for the doctrine provides no support for doing so." Id. at 129.

See id. at 119 ("In this case, a private engineering firm lawfully contracted with a governmental unit to design and construct a roadway, and a third party sued the firm for negligence in carrying out its responsibilities."), 122 ("In this case ... a private company that performed allegedly negligent acts in carrying out a contract with a governmental unit seeks to invoke the same immunity that the government itself enjoys."), 122-23 (summarizing the issue presented as "whether, as a matter of common law, the boundaries of sovereign immunity encompass private governmental contractors exercising their independent discretion in performing governmental functions"), 123 (referring to issue presented in terms of "holding a private party liable for its own improvident actions in performing a government contract"), 125-26 ("In this case, the Olivareses do not complain of harm caused by Brown & Gay's implementing the Authority's specifications or following any specific government directions or orders.... Further, the Olivareses do not complain about the decision to build the Tollway or the mere fact of its existence, but that Brown & Gay was independently negligent in designing the signs and traffic layouts for the Tollway. Brown & Gay's decisions in designing the Tollway's safeguards are its own."), 126 ("[T]he Olivareses do not assert that Brown & Gay is liable for the Authority's actions; they assert that Brown & Gay is liable for its own actions."), 126 ("The evidence shows that Brown & Gay was an independent contractor with discretion to design the Tollway's signage and road layouts.").

Wasson , 489 S.W.3d at 431.

See ids="6799983" index="119" url="https://cite.case.law/sw3d/489/427/#p429">id. at 432.

See ids="6799983" index="120" url="https://cite.case.law/sw3d/489/427/#p429">id. at 432-33.

See, e.g. , Lueck , 290 S.W.3d at 880 ("The State and other state agencies like TxDOT are immune from suit and liability in Texas unless the Legislature expressly waives sovereign immunity." (citing City of Sunset Valley , 146 S.W.3d at 641 )); Herring v. Houston Nat'l Exch. Bank , 114 Tex. 394, 269 S.W. 1031, 1033-34 (1925) (observing that if Texas's Board of Prison Commissioners "can be sued without legislative consent, it being purely a governmental agency or department, then the government, the sovereignty, can be so sued").

See Wasson , 489 S.W.3d at 432 (" 'In Texas, the people's will is expressed in the Constitution and laws of the State,' and thus 'to waive immunity, consent to suit must ordinarily be found in a constitutional provision or legislative enactment.' " (quoting Wichita Falls State Hosp. v. Taylor , 106 S.W.3d 692, 695 (Tex. 2003) )). But while the Legislature can thereby decide when or how to waive sovereign immunity once it is held to apply, the Judiciary is the arbiter of whether that immunity exists or applies in the first instance, as the doctrine has remained a creature of the common law. See ids="9114989" index="127" url="https://cite.case.law/sw3d/106/692/#p695">id. (observing that sovereign immunity "has developed through the common law-and has remained there," and that "as the arbiter of the common law, the judiciary has historically been, and is now, entrusted with 'defin[ing] the boundaries of the common-law doctrine and ... determin[ing] under what circumstances sovereign immunity exists in the first instance' ") (citing Reata Constr. Corp. v. City of Dallas , 197 S.W.3d 371, 375 (Tex. 2006) ).

See itation index="129" url="https://cite.case.law/citations/?q=16%20Tex.%20Admin.%20Code%20%C2%A7%20401.302">id. at 431-32 & n.5.

See itation index="130" url="https://cite.case.law/citations/?q=16%20Tex.%20Admin.%20Code%20%C2%A7%20401.302">id. at 432 ; Brown & Gay , 461 S.W.3d at 121-22.

Brown & Gay , 461 S.W.3d at 121 (internal quotations omitted).

See Wasson , 489 S.W.3d at 429-30, 433-34. These "governmental" functions stand in contrast to the "proprietary" functions that municipalities can perform, described generally as discretionary functions "not done as a branch of the state, but instead 'for the private advantage and benefit of the locality and its inhabitants.' " See ids="6799983" index="134" url="https://cite.case.law/sw3d/489/427/#p429">id. at 433-34 (quoting City of Galveston v. Posnainsky , 62 Tex. 118, 127 (1884) ). Proprietary functions, the Texas Supreme Court has reasoned, are "[l]ike ultra vires acts" for sovereign-immunity purposes, in that "acts performed as part of a city's proprietary function ... are not performed under the authority, or for the benefit, of the sovereign." Id. at 434.

See City of El Paso v. Heinrich , 284 S.W.3d 366, 377 (Tex. 2009).

See ids="7301546" index="137" url="https://cite.case.law/sw3d/284/366/#p377">id. at 373 (quoting Koseoglu , 233 S.W.3d at 844 (quoting Kentucky v. Graham , 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) )).

See Franka v. Velasquez , 332 S.W.3d 367, 382-83 (Tex. 2011).

Id.

See Heinrich , 284 S.W.3d at 372-73.

See Wasson , 489 S.W.3d at 433 (observing that governmental acts "done 'without legal authority' are not done as a branch of the state. By definition, they fail to derive that authority from the root of our state's immunity-the sovereign will.").

See Heinrich , 284 S.W.3d at 372-73.

Id. at 372.

See itation index="148" url="https://cite.case.law/citations/?q=16%20Tex.%20Admin.%20Code%20%C2%A7%20401.302">id. ; Director of Dep't of Agric. & Env't v. Printing Indus. Ass'n of Tex. , 600 S.W.2d 264, 265-66 (Tex. 1980) ; see also Bacon v. Texas Historical Comm'n , 411 S.W.3d 161, 173 (Tex. App.-Austin 2013, no pet.) (observing that suit that complains of governmental actions within legal authority "implicates sovereign immunity because it seeks to 'control state action,' to dictate the manner in which officers exercise their delegated authority" (citing Heinrich , 284 S.W.3d at 372 ; Creedmoor-Maha , 307 S.W.3d at 515-16 )).

See Heinrich , 284 S.W.3d at 373-76 (otherwise-proper ultra vires claims implicate immunity to extent remedy has effect of retrospective monetary relief); IT-Davy , 74 S.W.3d at 855-56 (contrasting permissible ultra vires claims with "suits against state officials seeking to establish a contract's validity, to enforce performance under a contract, or to impose contractual liabilities," which "are suits against the State ... because [they] attempt to control state action by imposing liability on the State"); W.D. Haden Co. v. Dodgen , 158 Tex. 74, 308 S.W.2d 838, 840 (1958) ("There is a clear distinction between [permissible ultra vires claims] and suits brought against an officer to prevent exercise by the state through some officer of some act of sovereignty, or suits against an officer or agent of the state to enforce specific performance of a contract made for the state, or to enjoin the breach of such contract, or to recover damages for such breach, or to cancel or nullify a contract made for the benefit of the state.") (quoting Imperial Sugar Co. v. Cabell , 179 S.W. 83, 89 (Tex. Civ. App.-Galveston 1915, no writ) ); see also Texas Dep't of Transp. v. Sawyer Trust , 354 S.W.3d 384, 388 (Tex. 2011) (observing that "sovereign immunity will bar an otherwise proper [ultra vires ] claim that has the effect of establishing a right to relief against the State for which the Legislature has not waived sovereign immunity") (citing City of Hous. v. Williams , 216 S.W.3d 827, 828-29 (Tex. 2007) (per curiam)).

See , e.g. , Sawyer Trust , 354 S.W.3d at 389 (regarding ultra vires claims, observing that "[t]he central test for determining jurisdiction" looks to whether 'the real substance' of the plaintiff's claims" is within the trial court's jurisdiction (citing Dallas Cty. Mental Health & Retardation v. Bossley , 968 S.W.2d 339, 343-44 (Tex. 1998) )); Heinrich , 284 S.W.3d at 377 (concluding that claims asserted against individual members of governing body, without specifying capacity in which they were sued, implicated their official capacities because the requested relief would compel payments from the public treasury and, as such, "would necessarily come from the Board, rather than the individual members"; further observing that capacity in which governmental agent is sued sometimes must be determined from "the nature of the liability sought to be imposed" as indicated in the "course of proceedings" (quoting Graham , 473 U.S. at 167 n.14, 105 S.Ct. 3099 )); Williams , 216 S.W.3d at 828-29 (attempted ultra vires suit that would have effect of compelling payment of retrospective monetary relief from public treasury held barred by immunity); City of Austin v. Utility Assocs., Inc. , 517 S.W.3d 300, 311-13 (Tex. App.-Austin 2017, pet. denied) (otherwise-proper ultra vires claim would implicate governmental immunity to extent remedy would "undo" previously executed government contract); Texas Logos, L.P. v. Texas Dep't of Transp. , 241 S.W.3d 105, 118-23 (Tex. App.-Austin 2007, no pet.) (same).

See Ex parte Springsteen , 506 S.W.3d at 797, 802 (declaratory-judgment suit by former death-row inmate seeking determination of "actual innocence," though styled as an "ex parte" proceeding, did not avoid implicating sovereign immunity because "the substantive effect of any claim seeking to determine his status under the criminal law would operate against the State of Texas, in whose name and by whose authority the criminal law is enforced").

See, e.g. , Dodgen , 308 S.W.2d at 840 ; Utility Assocs., Inc. , 517 S.W.3d at 311-13 ; Texas Logos, L.P. , 241 S.W.3d at 118-23.

See , e.g. , Heinrich , 284 S.W.3d at 372 ; Printing Indus. Ass'n of Tex. , 600 S.W.2d at 265-66.

See Utility Assocs., Inc. , 517 S.W.3d at 307 ("This inquiry [regarding sovereign or governmental immunity as it bears on subject-matter jurisdiction] is not necessarily confined to the precise jurisdictional challenges presented by the parties, because jurisdictional requirements may not be waived and 'can be-and if in doubt, must be-raised by a court on its own at any time,' including on appeal.") (quoting Finance Comm'n of Tex. v. Norwood , 418 S.W.3d 566, 580 (Tex. 2013) (citing Texas Ass'n of Bus. v. Texas Air Control Bd. , 852 S.W.2d 440, 445-46 (Tex. 1993) )).

See Heinrich , 284 S.W.3d at 372 (recognizing that distinction between governmental action that is within delegated authority versus ultra vires reflects uses of appropriated funds that are for intended versus unintended purposes, respectively); Bacon , 411 S.W.3d at 173 (observing that "principle of judicial deference embodied in sovereign immunity extends not only to the Legislature's choices as to whether state funds should be spent on litigation and court judgments versus other priorities, but equally to the policy judgments embodied in the constitutional or statutory delegations that define the parameters of an officer's discretionary authority and the decisions the officer makes within the scope of that authority" (citing Sefzik , 355 S.W.3d at 621 (citing Dodgen , 308 S.W.2d at 839 )); Heinrich , 284 S.W.3d at 372 ; Printing Indus. Ass'n of Tex. , 600 S.W.2d at 265 ).

See Brown & Gay , 461 S.W.3d at 123-24.

See Leitch v. Hornsby , 935 S.W.2d 114, 117 (Tex. 1996) (noting example of an agent who negligently causes an automobile accident while acting within the course and scope of employment-both the principal and agent may be held liable, the former through respondeat superior , the latter by virtue of "the duty of reasonable care to the general public" owed by the agent "regardless of whether the auto accident occurs while driving for the employer" (citing Restatement (Second) of Agency §§ 343, 350 (1958) )).

Franka , 332 S.W.3d at 383 ("[P]ublic employees (like agents generally) have always been individually liable for their own torts, even when committed in the course of employment." (footnotes omitted)); see Heinrich , 284 S.W.3d at 373 n.7 ("State officials may, of course, be sued in both their official and individual capacities."); House v. Houston Waterworks, Co. , 88 Tex. 233, 31 S.W. 179, 181 (1895) ("It is well settled that a public officer or other person who takes upon himself a public employment is liable to third persons in an action on the case for any injury occasioned by his own personal negligence or default in the discharge of his duties." (internal quotation marks and citation omitted)).

This relationship also obviates any perceived potential tension between the Brown & Gay court's discussion of sovereign immunity's fiscal justification and the controlling-state-action line of cases. See Brown & Gay , 461 S.W.3d at 131 (Hecht, C.J., concurring) (citing Sefzik and urging that "[t]he Court's restricted view of the purpose of immunity is not supported by authority"). In any event, the Brown & Gay court did not profess to overrule that age-old line of cases. See , e.g. , Sefzik , 355 S.W.3d at 621 ; Printing Indus. of Tex. , 600 S.W.2d at 265 ; Dodgen , 308 S.W.2d at 839 ; Short v. W.T. Carter & Bro. , 133 Tex. 202, 126 S.W.2d 953, 962 (1939). Under the logic of the controlling-state-action line of cases, immunity would be implicated by the sorts of claims against contractors that the Brown & Gay court emphasized in the "Private Contractors Exercising Independent Discretion" portion of its opinion.

See Nettles , 2017 WL 3097627, at *8-9.

See Freeman v. American K-9 Detection Servs. , 494 S.W.3d 393, 404 (Tex. App.-Corpus Christi 2015, pet. granted) ("[T]he Texas Supreme Court has held that a government contractor 'is not entitled to sovereign immunity protection unless it can demonstrate its actions were actions of the [governmental entity], executed subject to the control of the [governmental entity]' ... [i]n other words, 'private parties exercising independent discretion are not entitled to sovereign immunity.' " (quoting Brown & Gay , 461 S.W.3d at 124 ; K.D.F. , 878 S.W.2d at 597 )); Lenoir , 491 S.W.3d at 82 ("The [Brown & Gay ] Court held that a private entity contracting with the government may benefit from sovereign immunity if 'it can demonstrate that its actions were actions of the ... government' and that 'it exercise[d] no discretion in its activities.' " (quoting Brown & Gay , 461 S.W.3d at 124-25 (quoting K.D.F. , 878 S.W.2d at 597 ))).

360 S.W.2d 787 (Tex. 1962).

See ids="10172740" index="203" url="https://cite.case.law/sw2d/360/787/">id. at 788-89.

See id. at 788-89, 793-94.

See ids="10172740" index="205" url="https://cite.case.law/sw2d/360/787/">id. at 789-90.

See ids="10172740" index="206" url="https://cite.case.law/sw2d/360/787/">id. at 790-91.

Id.case-ids="10172740" index="207" url="https://cite.case.law/sw2d/360/787/"> at 790.

See id. at 794, 803 (supp. op. on reh'g).

Id. at 794, 803 (supp. op. on reh'g).

Id. at 803 (supp. op. on reh'g).

343 S.W.3d 420 (Tex. 2011).

See ids="7319098" index="212" url="https://cite.case.law/sw3d/343/420/">id. at 422-23.

See ids="7319098" index="213" url="https://cite.case.law/sw3d/343/420/">id. at 423.

See itation index="214" url="https://cite.case.law/citations/?q=16%20Tex.%20Admin.%20Code%20%C2%A7%20401.302">id.

See itation index="215" url="https://cite.case.law/citations/?q=16%20Tex.%20Admin.%20Code%20%C2%A7%20401.302">id.

See id. at 423-24 & n.5.

See ids="7319098" index="217" url="https://cite.case.law/sw3d/343/420/">id. at 423-26.

Id. at 422.

See itation index="219" url="https://cite.case.law/citations/?q=16%20Tex.%20Admin.%20Code%20%C2%A7%20401.302">id. at 422-23 & n.2.

See ids="7319098" index="220" url="https://cite.case.law/sw3d/343/420/">id. at 422.

See ids="7319098" index="221" url="https://cite.case.law/sw3d/343/420/">id. at 424.

See itation index="222" url="https://cite.case.law/citations/?q=16%20Tex.%20Admin.%20Code%20%C2%A7%20401.302">id.

Id.

Id.

See id. at 424-25.

Id.case-ids="7319098" index="226" url="https://cite.case.law/sw3d/343/420/"> at 424. The Keller court summarized Glade 's holding as "the contractor could not be held liable because it was the City's responsibility to obtain the necessary right-of-way, not the contractor's." Id. at 425. "Our holding in Glade ," it added, "stands for the limited proposition that, to the extent it operates within the parameters of the governing contract, a contractor is justified in assuming that the government entity has procured the necessary right-of-way." Id.

See itation index="229" url="https://cite.case.law/citations/?q=16%20Tex.%20Admin.%20Code%20%C2%A7%20401.302">id. at 425 & n.6.

See ids="7319098" index="230" url="https://cite.case.law/sw3d/343/420/">id. at 425-26. In terms of the duty analysis, the court emphasized "the consequences of placing the duty on the defendant," Keller, in light of the contract terms. See ids="7319098" index="231" url="https://cite.case.law/sw3d/343/420/">id. at 425 ; see also ids="7319098" index="232" url="https://cite.case.law/sw3d/343/420/">id. ("Any ... determination [of duty] involves the balancing of a variety of factors, 'including the risk, foreseeability, and likelihood of injury, and the consequences of placing the burden on the defendant.' " (quoting Del Lago Partners, Inc. v. Smith , 307 S.W.3d 762, 767 (Tex. 2010) )).

Id. at 425-26.

Id. at 425 (citing Gehring , 360 S.W.2d at 794 ).

Id. (quoting Gehring , 360 S.W.2d at 803 (supp. op. on reh'g)).

Brown & Gay , 461 S.W.3d at 130 n.6 (Hecht, C.J., concurring).

Tex. Const. art. III, § 47 (e); cf. id. § 47 (a) ("The Legislature shall pass laws prohibiting lotteries and gift enterprises in this State other than those authorized by Subsections (b), (d), (d-1), and (e) of this section.").

See generally Tex. Gov't Code ch. 466.

Id. § 466.014(a); see also id. § 467.101(a) (TLC "has broad authority and shall exercise strict control and close supervision over all activities authorized and conducted in this state under ... Chapter 466 of this code."). The Lottery Act defines "lottery" as "the procedures operated by the state under this chapter through which prizes are awarded or distributed by chance among persons who have paid, or unconditionally agreed to pay, for a chance or other opportunity to receive a prize." Id. § 466.002(5).
The TLC and the office of executive director are established under Chapter 467 of the Government Code. See generally id. ch. 467.

See id. § 466.015; see also id. § 467.102 ("The commission may adopt rules for the enforcement and administration of this chapter and the laws under the commission's jurisdiction.").

Id. § 466.251(a).

See 16 Tex. Admin. Code § 401.302 (2007) (Tex. Lottery Comm'n, Instant Game Rules); see also itation index="248" url="https://cite.case.law/citations/?q=16%20Tex.%20Admin.%20Code%20%C2%A7%20401.302">id. § 401.301(20) (2007) (Tex. Lottery Comm'n, Definitions) (defining "Instant game" as "[a]n instant ticket lottery game, developed and offered for sale to the public in accordance with commission rules, that is played by removing the latex covered play area on an instant ticket to reveal the ticket play symbols"), (35) (defining "Play symbol" as "[t]he printed data under the latex on the front of an instant ticket that is used to determine eligibility for a prize"). The "instant" moniker apparently references that a ticket's status as a winner can be ascertained immediately upon validation, in contrast to lottery games (such as the familiar Lotto Texas game) in which such status is determined through subsequent drawings.

See id. §§ 401.301(35) (play symbols "for individual games will be specified in individual instant game procedures"), .302(b) (describing contents of game procedures for instant games, which "shall be published in the Texas Register and shall be made available upon request to the public").

See id. § 401.302(c)(2), (d).

Tex. Gov't Code § 466.252(a).

Id.

16 Tex. Admin. Code § 401.302(k).

Id. § 401.302(i).

Id.

Tex. Const. art. III, § 47 (e).

Tex. Gov't Code § 466.014(b) ; see also id. §§ 466.014(c) (awardee must be eligible for sales agent license), .1005-.101 (procurement procedures).

Each of the two contracts consists of an executed "contract" document with incorporated (and much lengthier) exhibits that include a preceding request for proposal (RFP). Although copies of the two "contract" documents are included in the appellate record, copies of the RFPs were not. However, appellees' live pleadings cross-referenced the RFPs by citing to the TLC's website, where the RFPs and other contract-related documents have been made available to the public. As there has been no objection to the district court's consideration of the RFPs as components of the two contracts, we have taken account of their material terms in our discussion and analysis.

The initial version had used dollar-bill icons rather than "5s" in the tic-tac-toe grid, while "5s" rather than moneybag icons were used in the PRIZE box.

See Nettles , 2017 WL 3097627, at *9.

See, e.g., City of Bellaire v. Johnson, 400 S.W.3d 922, 923 (Tex. 2013) (explaining that employer does not possess "right to control the progress, details, and methods of operations of the work" of an independent contractor); Industrial Indemnity Exch. v. Southard , 138 Tex. 531, 160 S.W.2d 905, 907 (1942) ("A[n] [independent] contractor is any person who ... undertakes to do a specific piece of work for other persons, using his own means and methods, without submitting himself to their control in respect to all its details." (citing Shannon v. West Indem. Co. , 257 S.W. 522, 524 (Tex. Comm'n App. 1924, judgm't adopted) )).

See Brown & Gay , 461 S.W.3d at 119 (observing that under the relevant contract, "the Authority delegated the responsibility of designing road signs and traffic layouts to Brown & Gay, subject to approval by the Authority's Board of Directors" (emphasis added)).

And this feature of Brown & Gay belies GTECH's view that the Texas Supreme Court there endorsed the "line of federal cases involving the federal government contractor defense" that emanate from Boyle v. United Tech. Corp. , 487 U.S. 500, 513, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), and hold that "immunity" extends to contractors who contribute an allegedly defective design "so long as the specification was reviewed by the government and included in the final specifications approved by the government." The "federal case law" cited favorably by the Brown & Gay court instead emanates from Yearsley . See Brown & Gay , 461 S.W.3d at 124-26. While the concepts are sometimes confused or conflated by lower courts, Boyle actually recognized a federal common-law "government-contractor defense" or "military contractor defense," distinct from the Yearsley concept, that is rooted in preemption concepts. See Campbell , 136 S.Ct. at 583-84 (more recently applying Yearsley concept with no mention of Boyle or its contractor-immunity standard); see also Jason Malone, Derivative Immunity: The Impact of Campbell-Ewald Co. v. Gomez, 50 Creighton L. Rev. 87, 103-15 (2016) (distinguishing the Yearsley and Boyle lines of precedents and noting how courts have sometimes confused them). The Texas Supreme Court has elsewhere recognized the character of the Boyle concept, see Torrington v. Stutzman , 46 S.W.3d 829, 846-47 (Tex. 2000) (explaining that Boyle "government-contractor defense, also called the military contractor defense, is a federal-common law defense ... based upon the premise that liability claims arising from government procurement contracts could create a significant conflict between state tort law and the federal interest in immunizing the federal government from liability for performing a 'discretionary function,' an act for which the government may not be sued under the Federal Tort Claims Act"), and this is not the concept it addressed in Brown & Gay . Cf. Brown & Gay , 461 S.W.3d at 124-26.

Cf. Brown & Gay , 461 S.W.3d at 129 (citing Gehring with approval as "holding, in the context of rejecting the 'accepted work' doctrine, that a county contractor hired to relocate fencing alongside widened roads was not insulated from tort liability for injuries that occurred after the county accepted the work but were caused by the condition in which the contractor left the premises").

The Steele Plaintiffs also emphasize deposition testimony in which their counsel succeeded in extracting acknowledgments from various GTECH or TLC witnesses that GTECH owed TLC "reasonable care" in providing non-misleading game instructions. GTECH disputes the competence or materiality of this testimony, observing that the scope of its discretion or duties relevant to the immunity inquiry are controlled by the two contracts, whose meaning is initially a question of law. We agree with GTECH. Such testimony regarding the existence of extra-contractual duties, if material to any issue, could go only to the merits of the Steele Plaintiffs' causes of action. And as we emphasize below, the merits are not properly before us.

See K.D.F. , 878 S.W.2d at 597 (advisor's "activities necessarily involve considerable discretion ... its role is more in the nature of advising [the government] how to proceed, rather than being subject to the direction and control of [the government]").

See Tex. Gov't Code § 466.252(a) ; 16 Tex. Admin. Code § 401.302(k), (i).

Brown & Gay , 461 S.W.3d at 130 n.6 (Hecht, C.J., concurring).

See, e.g. , Miranda , 133 S.W.3d at 227-28 (recognizing that jurisdictional challenges based on sovereign immunity may overlap the merits).

Wheelabrator Air Pollution Ctr., Inc. v. City of San Antonio , 489 S.W.3d 448, 453 (Tex. 2016) (quoting Bland Indep. Sch. Dist. v. Blue , 34 S.W.3d 547, 554 (Tex. 2000) ).

See Brown & Gay , 461 S.W.3d at 123-24.

Franka , 332 S.W.3d at 383 ; see Leitch , 935 S.W.2d at 117.

See, e.g. , Petco Animal Supplies, Inc. v. Schuster , 144 S.W.3d 554, 565(Tex. App.-Austin 2004, no pet.).